## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 03 2018, 10:11 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Sean C. Mullins
Appellate Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caroline G. Templeton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Thomas Raymond Smith,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

December 3, 2018

Court of Appeals Case No.
18A-CR-1121

Appeal from the Lake Superior
Court

The Honorable Diane Ross
Boswell, Judge

Trial Court Cause No.
45G03-1411-MR-9

**Bailey, Judge.**

# Case Summary

Thomas Raymond Smith ("Smith") challenges the trial court's decision to deny his motion to dismiss the charge against him on double jeopardy grounds, and his conviction for murder, a felony.[1]

We affirm.

# Issues

Smith raises two issues on appeal, which we restate as follows:

I.    Whether principles of double jeopardy required dismissal after the first mistrial because the prosecutor had intentionally provoked defendant to move for a mistrial at the initial trial.

II.   Whether the State presented sufficient evidence to support his murder conviction.

# Facts and Procedural History

In October of 2014, Smith and David Krawczenia ("Krawczenia") ran a business in which Krawczenia bought vehicles, Smith repaired those vehicles at his business, All About Auto, and Krawczenia then sold the vehicles. During the course of Smith's and Krawczenia's business relationship, Krawczenia paid

---

[1] Ind. Code § 35-42-1-1.

for the rent, tools and other equipment for All About Auto. As of November 2014, Smith owed Krawczenia approximately $16,000. Kevin Akers ("Akers") and Jack Hicks ("Hicks") worked for Smith at All About Auto. On more than one occasion, Smith had joked to Akers that it would be easier to "get rid of" Krawczenia than to pay the debt he owed to Krawczenia. Tr. Vol. III at 165.

[5] On Saturday, November 1, 2014, Hicks was working at All About Auto and helped Smith push a silver Grand Marquis vehicle with a dead battery into the garage. Akers called Smith at All About Auto around noon that day, and Smith told Akers that he was waiting for Krawczenia to come there to collect some money. Akers arrived at All About Auto around 3:00 p.m. on November 1 to collect some money Smith owed Akers. Around the same time, Melissa Garcia ("Garcia"), the marketing employee for All About Auto, also arrived at the business. Garcia was looking for Krawczenia and Smith told Garcia that Krawczenia had left All About Auto about an hour earlier that day.

[6] Krawczenia lived with his girlfriend, Theresa Jacobs ("Jacobs"). On the morning of November 1, Krawczenia told Jacobs that he was planning to do some campaigning in the morning and then collect a $16,000 debt. When Krawczenia failed to return home that evening, Jacobs drove to All About Auto three separate times to look for him. The third time she saw Krawczenia's car—a silver Chrysler Sebring—in the All About Auto parking lot. She looked into the car and saw some papers, a water bottle, and a phone charger. The following day, November 2, Jacobs filed a missing person's report with the Portage Police Department.

[7] On November 2, Akers met Smith at around noon for breakfast. Smith was agitated and, when Akers asked what was wrong, Smith replied, "It's done." Akers asked what was done, and Smith replied, "Dave [Krawczenia]. Dave's dead. I shot him." Tr. Vol. III at 151-52. Smith told Akers that, on November 1, while Krawczenia was throwing spent fireworks out of the trunk of the Grand Marquis that was in the All About Auto shop, Smith came up behind Krawczenia and shot him. Smith told Akers he had shot Krawczenia "not long before" Akers had arrived at the shop on November 1. *Id.* at 153. Smith told Akers that Smith put Krawczenia in the trunk of the Grand Marquis, pushed the vehicle outside of the shop, and had it towed off the All About Auto parking lot.

[8] A tow truck driver who Smith frequently employed towed a vehicle he recalled as either a Grand Marquis or a Grand Victoria from All About Auto to a new garage that Smith intended to rent, Road Running Garage, on November 1. Smith met the tow truck driver at All About Auto and followed him to the Road Running Garage. Smith's cell phone activity was consistent with him being near All About Auto on November 1 until about 4:30 p.m., and then his cell phone activity placed him near the Road Running Garage.

[9] On the morning of November 3, Reggie Russell ("Russell"), a friend of Krawczenia's, went to All About Auto to look for Krawczenia because Jacobs had told him that Krawczenia was missing. Russell saw Krawczenia's silver Sebring in the All About Auto parking lot. Smith arrived at All About Auto about twenty minutes later, and Russell told Smith that Krawczenia was

missing. Russell asked Smith if he had seen Krawczenia, and Smith stated that Krawczenia had left with "two rugged black guys" in the early afternoon of Saturday, November 1, to purchase a vehicle. Tr. Vol. III at 61, 62-63. Smith told Russell that Smith had given Krawczenia $10,000 in payment on the debt he owed before Krawczenia had left All About Auto on November 1. Russell asked Smith if he had the keys to Krawczenia's Sebring and Smith did. Smith and Russell looked in the trunk of Krawczenia's Sebring and saw only some brake pads. Russell saw "a couple water bottles" inside the Sebring's interior. *Id*. at 65.

[10] On November 3, Detective Ed Jenkins of the Lake County Sheriff's Department ("Det. Jenkins"), who was assigned to investigate the missing person report regarding Krawczenia, spoke with Smith at All About Auto. Smith informed Det. Jenkins that Krawczenia had left All About Auto on November 1 with a "black couple." Tr. Vol. V at 96. Det. Jenkins arranged for Smith to meet with him again for an interview on November 4 and 5 but Smith failed to attend either appointment. On November 5, Det. Jenkins went to All About Auto to look for Smith and noticed that Krawczenia's silver Sebring was no longer in the parking lot.

[11] On the morning of November 5, Smith made five phone calls. The location for each call was consistent with Smith being at the Mansards Apartments.

[12] On November 14, the Lake County Sheriff's Department was notified that the silver Chrysler Sebring was located in the parking lot of the Mansards

Apartment complex. The police transported the car to the police garage to search it. When the police opened the trunk, they found Krawczenia's body, absent the head and arms. Inside the Sebring, police found four water bottles, one of which was determined to have Smith's DNA on it.

[13] On November 17, 2014, the State charged Smith with murder, a felony. On February 21, 2017, Smith's first jury trial began. The State called Jacobs as its first witness. Prosecutor Stanley Levco ("Levco") asked Jacobs when she next saw Smith after seeing him at All About Auto on November 2, 2014, and Jacobs responded that she next saw him at the "let to bail hearing in January." Tr. Vol. II at 52. Defense counsel asked to approach the bench and requested a mistrial because Jacobs's reference to Smith needing bail was prejudicial. The trial court denied that request. Levco informed the trial court and defense counsel that he had not intended to elicit information concerning the bail hearing by his question.

[14] During cross-examination, defense counsel asked Jacobs about a prior deposition in an attempt to impeach her. Jacobs responded that her first deposition was at the bail hearing. Defense counsel again moved for a mistrial, alleging that Jacobs was intentionally trying to put prejudicial information before the jury. The trial court found that defense counsel failed to meet his burden to demonstrate that Smith was put in grave peril. However, it noted that, if the information was divulged again, the court would "grant any motion that [defense counsel] make[s]" Tr. Vol. II at 84. The trial court admonished

Jacobs again to answer only the questions posed to her by counsel, to not expound, and to not refer to the bail hearing as such.

[15] On the State's opportunity for re-direct examination of Jacobs, Levco asked permission to ask questions about subjects not covered on cross-examination, and the trial court granted that request. The prosecutor showed Jacobs three photographs of the All About Auto building and parking lot that were not admitted earlier because a proper foundation had not been laid through Jacobs. Defense counsel objected and, because the trial court believed that the witness was attempting to listen to the bench conference, the court held a discussion in the judge's chambers off the record. The agreed upon procedure appeared to be that the prosecutor would again go through the foundational question and then defense counsel would have the opportunity to voir dire the witness before the court ruled on the admission of the photographs.

[16] During the voir dire examination, Jacobs stated that she did not know when the photographs were taken. Defense counsel asked Jacobs if the prosecutor had ever shown her and discussed with her the photographs, and Jacobs responded that it was Levco's predecessor prosecutor who showed her the pictures and discussed them with her. Tr. Vol. II at 144. At a bench conference, defense counsel argued that, because Levco had told the trial court and defense counsel in chambers that he had shown the pictures to Jacobs and discussed them with her, defense counsel now had to call Levco as a witness to impeach Jacobs's claims that Levco never showed her the pictures or discussed them with her. Levco stated that he did not remember whether he showed Jacobs the pictures,

but he knew that she had told him she would be able to identify the pictures. Levco said he believed he had told the defense lawyer and the judge in chambers that he "wasn't sure whether [he showed Jacobs the picture] or not." *Id*. at 150. Levco's co-counsel then informed the court that Levco had experienced "some memory issues" while preparing for the trial. *Id*. at 150-51. The trial court noted that Levco had earlier stated in chambers, "I showed her photos at lunch during the lunch break." *Id*. at 151. The trial court stated that it believed Levco was "having some memory issues" but did not believe the prosecutor was "intentionally trying to mislead the Court or anything." *Id*. at 152. Defense counsel again asked for a mistrial because he believed that Jacobs's testimony put Levco in a compromised position. The photographs were not admitted into evidence, and the trial court granted the mistrial, over the State's objection.

[17] On April 6, 2017, Smith filed a motion to dismiss in which he alleged that the prosecutor had engaged in intentional misconduct with respect to the attempts to admit the photographs through Jacobs and that such misconduct created the need for a mistrial. The court held a hearing on April 7, at which point defense counsel rested on his written motion. The trial court concluded that there was "no showing of intentional misconduct by the State[;]" rather, the State "had an out of control witness." Tr. Vol. II at 176. The trial court denied the motion to dismiss.

[18] Smith's second jury trial occurred from February 26, 2018, through March 2, 2018. The former doctor for Lake County who originally performed

Krawczenia's autopsy was unavailable to testify at the trial. His successor, Dr. John Feczko ("Dr. Feczko"), determined from his review of the records that Krawczenia died seven to fourteen days prior to the discovery of his body on November 14, 2014. Dr. Feczko accounted for the effect that cold weather would have on the decomposition of the body. Dr. Feczko concluded that Krawczenia's head and arms were removed after his death because there was no sign of vital reaction at the amputation sites. The head and arms had not been recovered and, because of that, Dr. Feczko was unable to determine the cause of death. Dr. Feczko discounted the previous doctor's determination that rigor mortis was present because the typical method for determining the presence of rigor mortis is by checking the hands, fingers, and arms. An accepted secondary methodology is by rotating the neck of the deceased. Because those methodologies were unavailable and because the previous doctor did not describe the method he used, Dr. Feczko did not rely on the conclusion that rigor mortis was present.

[19] Dr. Jonathan Arden, who was hired by Smith, testified that Krawczenia was dead less than eight to ten days at the time he was found. Dr. Arden based his conclusion in part on the original autopsy report concluding that Krawczenia's body was still in rigor mortis. He acknowledged that, if the report was wrong about the presence of rigor mortis, that could potentially change his opinion regarding the time of death.

[20] The jury returned a guilty verdict. On April 11, 2018, the court sentenced Smith to sixty years of imprisonment. This appeal ensued.

# Discussion and Decision

## Double Jeopardy

[21] Smith contends that principles of double jeopardy required dismissal of the charges after the first mistrial. We have recently addressed this precise issue:

> Both the United States and Indiana Constitutions forbid the State from placing a person twice in jeopardy. U.S. Const. amend. V; Ind. Const. Art. [1], § 14. Retrial following a defendant's successful mistrial motion is only barred where the government's conduct is responsible for the defendant's mistrial motion. *Butler v. State*, 724 N.E.2d 600, 603 (Ind. 2000). The essential inquiry is whether the prosecutor brought about the mistrial motion; that is, whether the prosecutor acted with the intent to cause termination of the trial by provoking or goading the defendant into moving for a mistrial. *Willoughby v. State*, 660 N.E.2d 570, 576 (Ind. 1996). If the prosecutor acted with the requisite intent, then double jeopardy bars a retrial. *Wilson v. State*, 697 N.E.2d 466, 472 (Ind. 1998). These rules have been codified at Indiana Code section 35-41-4-3, which provides as follows:
>
> (a) A prosecution is barred if there was a former prosecution of the defendant based on the same facts and for commission of the same offense and if:
>
> * * *
>
> (2) the former prosecution was terminated after the jury was impaneled and sworn or, in a trial by the court without a jury, after the first witness was sworn, unless (i) the defendant consented to the termination or waived, by motion to dismiss or otherwise, his right to object to the termination....

(b) If the prosecuting authority brought about any of the circumstances in subdivisions (a)(2)(i) through (a)(2)(vi) of this section, with intent to cause termination of the trial, another prosecution is barred.

*Harbert v. State*, 51 N.E.3d 267, 274 (Ind. Ct. App. 2016), *trans. denied*. We look at the prosecutor's subjective intent when determining whether he intended to provoke a mistrial. *Farris v. State*, 753 N.E.2d 641, 646 (Ind. 2001). The intent of the prosecutor is a factual determination which we review under the clearly-erroneous standard. *Id*. And, "[a]lthough a trial court's determination of prosecutorial intent is not conclusive for purposes of state appellate review, we do regard its determination as very persuasive." *Butler v. State*, 724 N.E.2d 600, 603-04 (Ind. 2000) (quotation and citation omitted).

[22] Here, Smith contends that the prosecutor's "continued insistence on introducing exhibits [i.e., the pictures] for which the witness [i.e., Jacobs] could not lay a proper foundation" evinced an intent on the prosecutor's part to "prematurely terminate the trial." Appellant's Br. at 13. However, it is unclear exactly what State action Smith believes was designed to provoke a mistrial. The basis for the mistrial was not the State's attempt to get the photographs admitted into evidence. Rather, it was the conflict between Jacobs's testimony that a prosecutor other than Levco had shown her the photos[2] and Levco's in-

---

[2] Thus, Smith is mistaken when he claims that Jacobs testified that "the State had never discussed the photographs with her." Appellant's Br. at 15. Rather, Jacobs testified that the prosecutor "previous" to Levco had discussed with her the photo that she was being shown at trial. Tr. Vol. II at 144.

chambers statement that he had shown Jacobs the photos, such that Levco would have to be called as a witness to impeach Jacobs's credibility. However, the prosecutor was not the one who elicited Jacobs's testimony that a different prosecutor showed her the photos; defense counsel did that. Because the prosecutor did not ask Jacobs who had shown her the photographs, there was no evidence that *the prosecutor* intended to provoke a mistrial by eliciting false testimony which could only be impeached by Prosecutor Levco.

[23] To the extent Smith contends that the mistrial was required because Levco falsely stated that he showed Jacobs the photographs, the trial court did not clearly err in concluding that there was no evidence that Levco intentionally deceived the court. Rather, the record supports the trial court's conclusion that Levco was experiencing difficulty with his memory during the trial. And a faulty memory is not evidence of an intent to deceive. The record further supports the trial court's conclusion that the prosecutor had no "control" over Jacobs and her testimony, especially since her problematic testimony was elicited by the defense counsel. Tr. Vol. II at 176.

[24] And, finally, to the extent Smith contends the mistrial was required by the State's failure to disclose Levco's memory problems,[3] he is mistaken. The court declared a mistrial on the assumption that Levco *did* previously show Jacobs

---

[3] As the State notes, Smith failed to raise this particular claim with the trial court. However, because double-jeopardy violations constitute fundamental error, they may be raised for the first time on appeal. *Garcia v. State*, 686 N.E.2d 883, 884 (Ind. Ct. App. 1997).

the photos and discuss them with her (regardless of whether Levco remembered doing so), that Jacobs's testimony conflicted with that fact, and that Levco would be required to testify against Jacobs in order for Smith to impeach her credibility. Thus, Levco's memory problems were irrelevant to the trial court's decision to declare a mistrial.[4]

[25] The trial court did not clearly err in denying Smith's motion to dismiss the charges against him on double jeopardy grounds.

## Sufficiency of the Evidence

[26] Smith challenges the sufficiency of the evidence to support his conviction for murder. Our standard of review of the sufficiency of the evidence is well-settled:

> When reviewing the sufficiency of the evidence needed to support a criminal conviction, we neither reweigh evidence nor judge witness credibility. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009). "We consider only the evidence supporting the judgment and any reasonable inferences that can be drawn from such evidence." *Id.* We will affirm if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt. *Id.*

---

[4] Similarly, Jacobs's testimony about Smith's previous bail hearing is also irrelevant because it did not serve as the basis for the trial court's declaration of a mistrial.

*Clemons v. State*, 996 N.E.2d 1282, 1285 (Ind. Ct. App. 2013), *trans. denied*. Moreover, "[a] conviction may be based on circumstantial evidence alone so long as there are reasonable inferences enabling the factfinder to find the defendant guilty beyond a reasonable doubt." *Lawrence v. State*, 959 N.E.2d 385, 388 (Ind. Ct. App. 2012) (citation omitted), *trans. denied*. And a conviction may be sustained on only the uncorroborated testimony of a single witness. *Bailey v. State*, 979 N.E.2d 133, 135 (Ind. 2012).

[27] To support Smith's conviction of murder, the State was required to show that Smith (1) knowingly or intentionally (2) killed (3) Krawczenia. I.C. § 35-42-1-1(1). The State provided evidence that Smith killed Krawczenia at All About Auto on November 1, 2014; placed the body in the Grand Marquis and towed that vehicle to Road Running Garage; subsequently transferred Krawczenia's body to the trunk of Krawczenia's Sebring; drove the Sebring to Mansards Apartments on or around November 5; and left the Sebring parked there. Akers testified that Smith confessed to him that he killed Krawczenia at All About Auto on November 1, 2014, placed Krawczenia's body in the Grand Marquis car, and had that car towed from the All About Auto lot to the Road Running Garage. Akers's testimony is bolstered by records of Smith's telephone calls from All About Auto and Road Running Garage on November 1 and the tow truck driver's testimony. The State also presented: witnesses' testimonies that Krawczenia's silver Sebring was at All About Auto until November 5 and that Smith had the keys to the Sebring; records of Smith's telephone calls from the location of the Mansards Apartments on November 5; and testimony that

Krawczenia's body was found in the trunk of his Sebring at the Mansards Apartments on November 14. And the State provided evidence, through Dr. Feczko's testimony, that Krawczenia was killed seven to fourteen days before his body was found on November 14. That was sufficient evidence to support a jury verdict that Smith killed Krawczenia on November 1, 2014. Smith's contentions to the contrary are simply requests that we reweigh the evidence and assess witness credibility, which we cannot do. *Clemons*, 996 N.E.2d at 1285.

# Conclusion

[28] The trial court did not clearly err in denying Smith's motion to dismiss the charges against him on double jeopardy grounds as there was no evidence that the prosecutor intentionally provoked the motion for a mistrial. And the State presented sufficient evidence that Smith murdered Krawczenia on November 1, 2014.

[29] Affirmed.

Mathias, J., and Bradford, J., concur.