# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 16 2019, 5:45 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark Small
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Laura R. Anderson
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Paul Reese, Jr., *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, *Appellee-Plaintiff.* | September 16, 2019 <br><br> Court of Appeals Case No. 18A-CR-1985 <br><br> Appeal from the Putnam Circuit Court <br><br> The Honorable Matthew L. Headley, Judge <br><br> Trial Court Cause No. 67C01-1708-F1-210 |

**Kirsch, Judge.**

Paul Reese, Jr. ("Reese") was convicted after a jury trial of burglary[1] as a Level 2 felony, conspiracy to commit burglary[2] as a Level 2 felony, conspiracy to commit armed robbery[3] as a Level 3 felony, confinement while armed with a deadly weapon[4] as a Level 3 felony, theft[5] as a Level 6 felony, auto theft[6] as a Level 6 felony, two counts of armed robbery,[7] each as a Level 3 felony, and burglary[8] as a Level 1 felony. As a result of these nine convictions, he was given a seventy-two-year aggregate sentence. Reese appeals his convictions and sentence and raises multiple issues for our review, which we consolidate and restate as:

    I.      Whether the trial court abused its discretion when it admitted certain evidence at trial, including cell phone records obtained as a result of a search warrant and a report regarding the contents of a cell phone;

    II.     Whether the State presented sufficient evidence at trial to support Reese's convictions;

---

[1] *See* Ind. Code § 35-43-2-1(3).

[2] *See* Ind. Code §§ 35-41-5-2, 35-43-2-1(3).

[3] *See* Ind. Code §§ 35-41-5-2, 35-42-5-1.

[4] *See* Ind. Code § 35-42-3-3.

[5] *See* Ind. Code § 35-43-4-2(a)(1)(A).

[6] *See* Ind. Code § 35-43-4-2.5.

[7] *See* Ind. Code § 35-42-5-1.

[8] *See* Ind. Code § 35-43-2-1(4).

III. Whether Reese's convictions violated the prohibitions against double jeopardy; and

IV. Whether Reese's seventy-two-year aggregate sentence is inappropriate in light of the nature of the offense and the character of the offender.

We affirm in part, reverse in part, and remand with instructions.

## Facts and Procedural History

Around 4:00 a.m. on April 2, 2017, Terry McCarter ("Terry"), who was seventy-nine at the time, and his wife, Patsy, were awakened by a loud crash in the area at the front of their house in Greencastle, Indiana. *Tr. Vol. 2* at 142-43, 168-69. Terry got out of bed to investigate while Patsy stayed in bed because she had a broken ankle and could not walk well. *Id*. at 143, 169. When he reached the front of the house, Terry was met by a masked gunman who said, "we're the police" and told Terry to "[l]ay down on the floor with your face down." *Id*. at 143. Terry knew that the gunman was not a police officer, but complied with his demand. *Id*.

Immediately following that, three other gunmen, who were all wearing masks, black clothes, gloves, some sort of stocking cap, and bandanas, came into the house. *Id*. at 143-45, 170-72. One man stayed and guarded Terry while another went into the bedroom to guard Patsy. *Id*. at 143. The man who went back to the bedroom pointed a gun at Patsy and told her, "You're going to be robbed." *Id*. at 170. He then went over to a dresser, where Patsy had eight drawers of

over 100 pieces of jewelry, and started emptying the drawers of jewelry into pillowcases. *Id*. at 170, 182. The man then found and took a .38 caliber pistol from the nightstand by the bed. *Id*. The man also took a small safe and additional jewelry from the bathroom. *Id*. at 172-73. The man turned the nightstand over, threw the dresser drawers all over the room, threw a lamp across the room, and "completely tore the bedroom up." *Id*. at 170. The man also turned over the Sleep Number mattress and pulled all of the hoses out of it. *Id*. at 173.

[5] The other two men proceeded to ransack the house and steal everything of any value in the home. *Id*. at 143. The men went into the attic, the basement, the barn, and the garage to steal valuable items. *Id*. at 143, 171. The men took Terry's wallet and pants that contained the keys to the couple's Buick Rendezvous, Patsy's purse, a pot where Terry threw spare change, and approximately $6,000 in cash. *Id*. at 145-47, 183-84. In addition to the pistol from the nightstand, the men stole a .223 rifle, a .22 rifle, a 12-gauge shotgun, a single-shot shotgun, an antique musket gun, and knives. *Id*. at 145, 184. They also stole various bottles of prescription medicine belonging to Terry and several cameras that Patsy used in her job. *Id*. at 184-85. The men took a chainsaw, air compressor, drills, and a lot of other smaller tools from the barn and garage as well. *Id*. at 145, 156, 184. If the men did not steal an item, they destroyed it, leaving the house in "total disarray." *Id*. at 143, 151, 171.

[6] While the men were going through the home, Terry heard one of the men referred to as "Dustin or Justin or something like that." *Id*. at 146. The men

also joked and laughed while ransacking the house, and one in particular had an extremely high-pitched laugh. *Id.* at 162, 176. The McCarters also noticed that one of the men was quite a bit taller than the rest of the men. *Id.* at 172.

[7] The men had been at the McCarters' home for more than an hour when the man guarding Terry ordered him into the bedroom with Patsy. *Id.* at 143-44. The men then ordered Terry and Patsy into the sunroom adjacent to their bedroom. *Id.* at 144, 174. All four men came into the area, and one of them put a gun to Patsy's head and said, "Tell us where your stash is or I'm going to blow her head off." *Id.* at 144, 174. Terry told the men, "You've got everything. I can't help you." *Id.* at 144. One of the men rushed into the sunroom at that time and hit Terry on the side of his head with the butt of a rifle. *Id.* at 144, 174. As a result, Terry was briefly knocked unconscious. *Id.* at 144. Patsy thought she and Terry were going to die. *Id.* at 174. The men locked Patsy and Terry in the sunroom, left the house, went to the garage, and drove away in the McCarters' white Buick Rendezvous. *Id.* at 144, 146, 165-66, 174.

[8] After waiting a short time to make sure the men were gone, Terry exited the sunroom through another door that the men had not locked, found a cell phone, got in their other car, drove up the hill to where he had sufficient cell phone service, and called 911. *Id.* at 144. Initially, the blow to his head did not bother Terry, but three days later, he went to the hospital because of a severe headache and learned that he had some bleeding of the brain. *Id.* at 153, 175. The doctors stated that Terry would likely suffer from a headache for a while as

his body absorbed the dried blood. *Id.* at 175. However, about two weeks later, Terry's headache worsened, and he had to be rushed to the hospital to have an emergency brain operation, where two holes were drilled in the side of his head to the let the blood drain and relieve the pressure on his brain. *Id.* at 152-53, 175. He was hospitalized following the surgery for a period of five days. *Id.* at 153.

[9] Putnam County Sheriff's Department Detective Douglas Nally ("Detective Nally") was the first detective to arrive on the scene, and as he walked through the house, he observed that every room had been rifled through and ransacked. *Id.* at 188. He discovered a boot print on a piece of plywood that had been used as a ramp for Patsy, since she had been using a knee scooter because of her broken ankle. *Id.* at 153, 190. Detective Nally also noticed tire tracks in the yard that appeared as though they had been made by a vehicle, possibly a dually truck,[9] with a trailer attached to it because there was a set of tracks that were normal sized with a smaller tire track next to it and there were tracks where there were two sets of tires together. *Id.* at 193-95.

[10] On April 4, 2017, Christina Blair ("Blair"), who lived on Spann Avenue in Indianapolis, Indiana saw a white Buick Rendezvous parked between 3835 and 3902 Spann Avenue and observed a tall white male, who fit the description of Daltyn Randolph ("Randolph"), exit the vehicle and walk into the house

---

[9] A dually truck is a truck that has dual rear wheels.

located at 3835 Spann Avenue. *Id*. at 210-11; *Tr. Vol. 3* at 8. Blair called police and reported the vehicle. *Tr. Vol. 2* at 211. After the vehicle was determined to be the McCarters' stolen car, police recovered it and took it to the Putnam County Sheriff's Department, where it was searched. *Id*. at 224. Inside the vehicle, the police found a timestamped receipt from a McDonald's restaurant a few blocks from Spann Avenue, dated April 2, 2017, at 7:36 a.m. *Id*. at 224-25. Putnam County Sheriff's Department Detective Patrick McFadden ("Detective McFadden") went to that McDonald's and obtained surveillance footage of the vehicle related to the receipt and observed that the driver was wearing dark gloves with white trim. *Id*. at 226, 228. Detective McFadden also drove past the 3835 Spann Avenue residence to gather information about the individuals living there. *Id*. at 228. As he drove behind the house, he noticed that the garage door was partially open, and an individual later identified as Justin Cherry ("Cherry") came out from under the garage door and stared at Detective McFadden's vehicle as it drove by. *Id*. at 229; *Tr. Vol. 3* at 6.

[11]     On April 9, 2017, an officer with the Indianapolis Metropolitan Police Department executed a search warrant concerning an unrelated matter at the garage at 3835 Spann Avenue. *Tr. Vol. 2* at 212. When the police arrived to execute the warrant, the garage door was open, Reese was sitting outside right in front of the garage, and Randolph showed up after the police had begun to search. *Id*. at 213, 221-22. As a result of the search, the police discovered a plastic grocery bag filled with miscellaneous items stolen from the McCarter residence including prescription pill bottles bearing Terry's name, mail, social

security cards, checks, a purse, and a wallet. *Id*. at 214, 216-19. The police obtained an additional search warrant for the house at 3835 Spann Avenue and executed that warrant on April 17, 2017. *Id*. at 229. When the officers arrived, they ordered the occupants of the house to come out, and Randolph, Steven Cosand ("Cosand"), Michael Hostetter, Ronnie Sosby and Cherry all eventually emerged from inside. *Id*. at 230; *Tr. Vol. 3* at 6. Cosand was a tenant in the house, and Randolph is Cosand's cousin. *Tr. Vol. 2* at 230; *Tr. Vol. 3* at 7, 57. While the men were outside, they were talking and laughing, and Detective McFadden noticed that Randolph, who was very tall, had a "very very shrill" laugh similar to Patsy's description of one of the perpetrators. *Tr. Vol. 2* at 231. Detective McFadden noted that Cherry's boots had a "strikingly similar" tread pattern to that of the boot print found on the plywood at the McCarters' residence, so his boots were collected and later compared to the boot print recovered from the robbery, and the tread pattern and size of the boots matched the impression. *Id*. at 232, 235-36, 247; *Tr. Vol. 3* at 71-72.

[12] Once inside the house, officers entered Cherry's bedroom and found the McCarters' safe with several pieces of Patsy's jewelry inside and Terry's .38 caliber handgun in a floor vent. *Tr. Vol. 2* at 231, 233. Throughout the house, the officers also found several pairs of gloves, several bandanas, and some stocking caps. *Id*. at 231-32, 236-37. Patsy recognized one pair of gloves as being similar to a pair she had seen on one of the men who burglarized her house. *Id*. at 237; *Tr. Vol. 3* at 85.

[13] As a result of a hit on LeadsOnline, a national database covering thousands of pawn stores that law enforcement uses to check for items that have been pawned, Detective McFadden recovered two of Patsy's bracelets at a Cash America pawn shop directly across the street from the McDonald's in the same area as 3835 Spann Avenue. *Tr. Vol. 2* at 191-92; *Tr. Vol. 3* at 3, 96. Detective McFadden obtained the pawn slip used to pawn those bracelets, and learned that Ashley Hillenburg ("Hillenburg"), who has a child with Reese, had pawned the items on April 7, 2017. *Tr. Vol. 3* at 3-4, 53. Hillenburg admitted that she had received the jewelry she pawned from Reese, who had given her the jewelry because she needed money to pay for necessities for their child, and Reese had no cash. *Id.* at 55-56. Reese and a man Hillenburg knew as "Drake"[10] went with her when she pawned the jewelry; Hillenburg pawned the items, gave the money to Reese, and he gave part of the money back to Hillenburg. *Id.* at 56, 58.

[14] Hillenburg and Reese also shared a storage unit; it was in Hillenburg's name, but Reese paid the bills, and both knew the four-digit PIN number that opened the gate and allowed them access to their specific unit. *Id.* at 53-55. The gate history log showed that the PIN number assigned to Hillenburg and Reese had been used to enter the facility at 8:29 a.m. and to exit at 8:34 a.m. on April 2, 2017. *Id.* at 12-13. The surveillance video showed a dark-colored dually pickup

---

[10] "Drake" was later determined to be Charles William Maybaum. *Tr. Vol. 3* at 44, 56-57.

truck entering and leaving at those times. *Id.* at 14. Surveillance video also showed Reese paying the bill for the storage unit on April 3, 2017, wearing a dark-colored shirt, dark beanie, and a bandana around his neck, which Patsy confirmed was similar to the clothing the perpetrators wore. *Id.* at 14-15, 85.

[15] On May 10, 2017, officers executed a search warrant on the storage unit rented by Hillenburg and Reese. *Id.* at 23. When the officers arrived at the storage unit, Reese was standing next to a maroon Chevy pickup truck in front of the open storage unit. *Id.* at 24, 27. The officers yelled, "Stop, police," but Reese refused all commands, jumped into the truck, and accelerated at a high rate of speed toward the officers. *Id.* at 24. Reese was not able to exit the facility through the only exit because it was blocked by one of the officer's vehicles, so Reese drove his truck through the fence. *Id.* Reese's truck became stuck because one of the tires was caught in the chain and poles of the fence. *Id.* at 24, 28-29. When the officers attempted to get Reese out of the truck, he put a .38 caliber revolver in his mouth. *Id.* at 24-25. A four-hour standoff ensued, which did not end until SWAT officers were able to disarm Reese and take him into custody. *Id.* at 25.

[16] During the standoff, Reese called his girlfriend, Emily Redmon ("Redmon"), and told her he was going to kill himself because he had "been caught." *Id.* at 76. Previously, in mid-April, Reese had talked to Redmon about a home invasion in Putnam County and told her that he needed to leave town and "lay low because the police were closing in on him." *Id.* at 74. After that conversation, Reese disappeared for about a week and a half. *Id.* at 74-75.

After he returned, Reese spoke to Redmon about the home invasion while at Drake's house, and at that time, Reese admitted he and others had taken a white Buick Rendezvous, a long gun, and some women's jewelry during the home invasion. *Id*. at 75-76. Redmon had seen some of the stolen jewelry and also observed the white Buick on Spann Avenue, where Reese stayed with Cherry, Cosand, and Randolph. *Id*. at 75-76.

[17] During the search of the storage unit, police discovered multiple items belonging to the McCarters, including a blue tub containing Terry's tools, a money box, a wooden drawer that had been pulled from a piece of furniture inside the McCarters' home, a clock, a box of several cameras, and mail addressed to the McCarters. *Id*. at 39, 47-50, 84-88. The police later searched Reese's truck and found Terry's .223 caliber bolt action rifle in the backseat. *Id*. at 34, 83.

[18] During the searches of the Spann Avenue house and garage, the police found two cell phones, one belonging to Randolph and one to Cosand. *Tr. Vol. 2* at 214, 232-33. After obtaining a search warrant for Randolph's phone, police downloaded the contents of the phone using a program called Oxygen Forensics and found contact information for a "Justin," with number 317-515-0876, "Paul," with number 317-495-5083, and "Drake" with number 317-378-0969, as well as a past search for the terms "couple held at gunpoint for an hour during home invasion near Greencastle" on a local news organization's website. *Tr. Vol. 3* at 42-44, 47; *State's Exs*. 107, 107a, 107b. Cosand's phone also contained the same contact information for a "Justin," a "Drake," a

"Daltyn," and a "Paul." *Tr. Vol. 2* at 233, 250; *Tr. Vol. 3* at 2; *State's Exs.* 88-90. The contact information for "Justin" matched a cell phone number that Cherry had previously provided to state government officials between September 2016 and January 2017. *Tr. Vol. 3* at 69; *State's Ex.* 37. Hillenburg also confirmed that Reese's phone number was 317-495-5083. *Tr. Vol. 3* at 58.

[19]     The police used the information obtained from these cell phones to obtain a search warrant for the records connected to Reese's phone number and for the phone numbers associated with Cherry and Drake. *Id.* at 90-95; *State's Exs.* 122, 125, 128. The data gathered from Cherry's phone showed Cherry in the area around the Spann Avenue address for most of the day on April 1, 2017, then traveling to Greencastle between 8:25 p.m. and 9:20 p.m. and remaining in Greencastle until 10 p.m. *Tr. Vol. 3* at 115; *State's Ex.* 133. Cherry's phone remained inactive from 9:56 p.m. on April 1 until the next morning at around 8:49 a.m., at which time, Cherry's phone showed it as being back in Indianapolis around Spann Avenue. *Tr. Vol. 3* at 115-16; *State's Ex.* 133. Drake's phone was also in the Indianapolis area for most of the day on April 1, but just before 7:00 p.m., the cell phone data showed Drake was traveling to Greencastle, arriving just before 8:00 p.m. *Tr. Vol. 3* at 116-17; *State's Ex.* 133. Drake's phone remained active in the Greencastle area from 8:00 p.m. until 2:46 a.m. *Tr. Vol. 3* at 117-18; *State's Ex.* 133. There was no activity after 2:46 a.m. until 10:00 a.m., at which time, activity showed his phone back in Indianapolis. *Tr. Vol. 3* at 118; *State's Ex.* 133. The cell phone data showed that Reese's phone was in the Indianapolis area until around 8:12 p.m., and at that

time, it started traveling to Greencastle, arriving at 8:50 p.m. *Tr. Vol. 3* at 118-19; *State's Ex*. 133. Reese's phone remained active in Greencastle until 3:22 a.m. and showed Reese traveling from Greencastle back to Indianapolis between 5:25 a.m. and 6:08 a.m. and then remaining in the Indianapolis area on April 2. *Tr. Vol. 3* at 119; *State's Ex*. 133. The cell phone records also established that Cherry and Drake had been communicating with one another and that Drake and Reese had been communicating with each other. *Tr. Vol. 3* at 125.

[20] On August 24, 2017, the State charged Reese with Level 2 felony burglary, Level 2 felony conspiracy to commit burglary, Level 3 felony armed robbery, Level 3 felony conspiracy to commit armed robbery, Level 3 felony criminal confinement, Level 6 felony theft, and Level 6 felony auto theft. *Appellant's App. Vol. 2* at 2.[11] On April 3, 2018, the State amended the two conspiracy counts and added two counts of Level 3 felony armed robbery and one count of Level 1 felony burglary; the State also dismissed the originally charged Level 3 felony armed robbery. *Id*. at 6, 37. On May 11, 2018, the State filed a second amended information regarding the two conspiracy counts, and on June 7, 2018, the State added a Level 5 felony burglary, Level 6 felony theft, Level 5 felony conspiracy to commit burglary, and Level 6 felony conspiracy to commit theft. *Id*. at 2, 7-8, 42.

---

[11] We note that Reese's Appellant's Appendix is missing pages 17-35, which according to the Table of Contents should contain the original charging informations and the probable cause affidavit.

On June 11, 2018, Reese filed a motion to suppress the cell phone records obtained as a result of the search warrant officers obtained for his phone number. *Appellant's App. Vol. 3* at 33-40. The trial court denied the motion to suppress. *Id*. at 56-59. A jury trial was held on July 16-18, 2018, at which Reese faced nine counts: Level 2 felony burglary; Level 2 felony conspiracy to commit burglary; Level 3 felony conspiracy to commit armed robbery; Level 3 felony confinement while armed with a deadly weapon; Level 6 felony theft; Level 6 felony auto theft; two counts of Level 3 felony armed robbery; and Level 1 felony burglary. During the trial, Reese objected each time evidence obtained as a result of the search warrant for his cell phone records was offered, and the trial court admitted the evidence over Reese's objection. *Tr. Vol. 3* at 95, 109. Reese also objected to the admission of the Oxygen Forensics report related to the physical search of Randolph's phone on foundational grounds and as to reliability, and the trial court overruled the objection. *Id*. at 45-46. At the conclusion of the jury trial, Reese was found guilty on all nine counts. *Id*. at 165. At the sentencing hearing, the trial court imposed an aggregate seventy-two-year sentence. Reese now appeals.

## Discussion and Decision

### I.    Admission of Evidence

Reese argues that the trial court abused its discretion both when it admitted evidence obtained as a result of the search warrant for cell phone records and when it admitted the report from Oxygen Forensics regarding contents of his cell phone. Our standard of review of a trial court's admission of evidence is an

abuse of discretion. *Mack v. State*, 23 N.E.3d 742, 750 (Ind. Ct. App. 2014), *trans. denied*. A trial court abuses its discretion if its decision is clearly against the logic and effect of the facts and circumstances before the court or if the court misapplies the law. *Id.* Even if the trial court's decision was an abuse of discretion, we will not reverse if the admission of evidence constituted harmless error. *Sugg v. State*, 991 N.E.2d 601, 607 (Ind. Ct. App. 2013), *trans. denied*. Error is harmless if it does not affect the substantial rights of the defendant. *Id.*

[23]   Reese initially contends that the admission of evidence obtained through the search warrant for his cell phone records was an abuse of discretion because the probable cause affidavit in support of the warrant was based on uncorroborated hearsay. He specifically argues that the affidavit contained statements by an incarcerated individual and did not contain any indicia of the reliability of this individual. Reese further asserts that the affidavit contained information from the execution of a different search warrant and that the affiant was not present for that search and had no firsthand knowledge of the information. Additionally, Reese claims that the affidavit contained information from another officer, and that information was not corroborated because it was not shown that that officer had actual knowledge of the information. Reese also maintains that the good faith exception does not apply here because the information contained in the affidavit was misleading.

[24]   "In deciding whether to issue a search warrant, '[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that

contraband or evidence of a crime will be found in a particular place.'" *Jackson v. State*, 908 N.E.2d 1140, 1142 (Ind. 2009) (quoting *Illinois v. Gates,* 462 U.S. 213, 238 (1983)). The duty of the reviewing court is to determine whether the magistrate had a "substantial basis" for concluding that probable cause existed. *Id.* A substantial basis requires the reviewing court, with significant deference to the magistrate's determination, to focus on whether reasonable inferences drawn from the totality of the evidence support the determination of probable cause. *Id.* (citing *Houser v. State,* 678 N.E.2d 95, 99 (Ind. 1997)). "Although we review *de novo* the trial court's substantial basis determination, we nonetheless afford 'significant deference to the magistrate's determination' as we focus on whether reasonable inferences drawn from the totality of the evidence support that determination." *Id.* (quoting *Houser*, 678 N.E.2d at 98-99).

[25] Probable cause is a fluid concept, which is decided based on the facts of each case. *Hurst v. State*, 938 N.E.2d 814, 817 (Ind. Ct. App. 2010). Probable cause to search premises is established when a sufficient basis of fact exists to permit a reasonably prudent person to believe that a search of those premises will uncover evidence of a crime. *Id.* Indiana Code section 35-33-5-2(b) requires that when a warrant is based on hearsay, the affidavit must either: "(1) contain reliable information establishing the credibility of the source and of each of the declarants of the hearsay and establishing that there is a factual basis for the information furnished; or (2) contain information that establishes that the totality of the circumstances corroborates the hearsay." The trustworthiness of hearsay for the purpose of proving probable cause can be established in a

number of ways, including where: (1) the informant has given correct information in the past; (2) independent police investigation corroborates the informant's statements; (3) some basis for the informant's knowledge is demonstrated; or (4) the informant predicts conduct or activity by the suspect that is not ordinarily easily predicted. *Bradley v. State*, 4 N.E.3d 831, 840-41 (Ind. Ct. App. 2014), *trans. denied*. These examples, however, are not exclusive, and, depending on the facts, other considerations may factor in when establishing the reliability of the informant or the hearsay. *Id*. at 841.

[26] Reese contends that statements made by Officer Matthew McFadden[12] ("Officer McFadden") regarding Reese being a known associate of Randolph and known to frequent the Spann Avenue residence where Randolph and Cherry lived were uncorroborated hearsay. He also takes issue with evidence that was found when the search was conducted at Reese's storage unit because the affiant was not present. However, the affiant was allowed to rely on this information under the collective or imputed knowledge doctrine. Under that doctrine, "an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation." *State v. Gray*, 997 N.E.2d 1147, 1153 (Ind. Ct. App. 2013), *trans. denied*. "So long as

---

[12] No relation to Putnam County Sheriff's Department Detective Patrick McFadden.

fellow officers applying for a search warrant collectively have probable cause, 'their individual knowledge can be imputed to the officer signing the affidavit in support of the search warrant.'" *McGrath v. State*, 95 N.E.3d 522, 530 (Ind. 2018) (quoting *Utley v. State*, 589 N.E.2d 232, 236 (Ind. 1992), *cert, denied*, 506 U.S. 1058 (1993)). The collective-knowledge doctrine presumes a fellow officer's credibility, and, therefore, no special showing of reliability need be made as a part of the probable cause determination. *Id*.

[27] Here, prior to the probable cause affidavit being filed, Officer McFadden had been engaged in an investigation of Reese as a suspect in the present offense; therefore, the statement attributed to him in the probable cause affidavit did not need to be independently corroborated to be relied upon as credible information supporting probable cause. As to the evidence discovered as a result of the search of the storage unit, the search was conducted by law enforcement pursuant to a valid search warrant supported by probable cause. This evidence and information gained by other officers could be imputed to the affiant in signing the affidavit in support of the search warrant for cell phone records. No special showing of reliability was needed.

[28] Reese also takes issue with information included in the affidavit, which was gained from an informant who was incarcerated at the time he provided information to the police. Michael Hostetter ("Hostetter") was inside the Spann Avenue house, where Randolph and Cherry lived, when the search warrant was executed on that house and items stolen from the McCarter residence as well as gloves similar to those one of the perpetrators wore were

found. *Appellant's App. Vol. 3* at 42. After the search occurred, Randolph, who would have known that items stolen in the burglary had been collected by the police, told Hostetter about the burglary of the McCarters and that Reese and Drake, as well as Randolph, were at the McCarter burglary. *Id.* Hostetter later provided this information to the police. *Id.* The police later searched Reese's storage unit and found mail addressed to the McCarters inside the storage unit. *Id.* at 43. The timing of Randolph's disclosure to Hostetter, as well as the fact that items stolen from the McCarters during the burglary were found in Randolph's house and in Reese's storage unit, connecting those two to the burglary, sufficiently corroborated the statements Hostetter made to the police that implicated Reese and Randolph in the crimes; therefore, the totality of the circumstances sufficiently corroborated Hostetter's hearsay statements.

[29] Moreover, even if the search warrant affidavit was defective, the exclusion of the evidence is not necessary if the officers acted in good faith when relying upon the search warrant. "Exclusion of evidence recovered pursuant to a search warrant issued by a judge or magistrate is not required when the officer obtaining the warrant has acted in objective good faith and within the scope of the warrant." *Gerth v. State,* 51 N.E.3d 368, 375 (Ind. Ct. App. 2016) (citing *United States v. Leon,* 468 U.S. 897, 920 (1984)). The good faith exception to the warrant requirement was created in large part because of the practical reality that once a neutral and detached magistrate has issued a search warrant, "'there is literally nothing more the policeman can do in seeking to comply with the law.'" *Jackson*, 908 N.E.2d at 1144 (quoting *Figert v. State,* 686 N.E.2d 827, 832-

33 (Ind. 1997) (quoting *Leon,* 468 U.S. at 921)). Officers are required to have a reasonable knowledge of what the law prohibits, but "imposing on officers the obligation to second guess a magistrate's decision in all but the most obvious instances of an affidavit lacking an indicia of probable cause is not a burden the law anticipates." *Id*. The good faith exception will not apply if the warrant was based on false information knowingly or recklessly supplied or if the affidavit or sworn testimony upon which probable cause rests is so lacking in indicia of probable cause as to render an official belief in the existence of the warrant unreasonable. *Hoop v. State*, 909 N.E.2d 463, 470-71 (Ind. Ct. App. 2009), *trans. denied*.

[30]  Reese contends that the good faith exception does not apply here because the information in the affidavit was misleading because it stated that the affiant found a phone number for "Paul Reese" on a cell phone determined to belong to Cosand. *Appellant's App. Vol. 2 at 42.* Reese asserts this information was false because the affiant did not find a phone number for Paul Reese on Cosand's cell phone; he found three numbers for "Paul" on the contacts of Cosand's cell phone. The statement by the affiant was not factually inaccurate, however, because Hillenburg had confirmed that one of the numbers for "Paul" found in Cosand's cell phone contact list belonged to Reese before the affidavit was written.[13] *Tr. Vol. 3 at 2-4, 23; Appellant's App. 3 at 42-43.* Further, the

---

[13] By the time the affidavit was submitted, the police had already learned that Hillenburg had pawned the stolen bracelets and that she and Reese shared a storage unit which the police had already searched. *Tr. Vol. 3* at 2-4, 23; *Appellant's App. Vol. 3* at 43.

affiant's omission of the fact that there were three numbers listed for "Paul" is irrelevant. The lack of this information does not make it any less true that the number for which the affiant sought a search warrant belonged to Reese. We, therefore, conclude that the good faith exception could apply. The trial court did not abuse its discretion in admitting the evidence obtained through the search warrant for Reese's cell phone records because the warrant was supported by probable cause, and even if it was not, the good faith exception applied.

[31]     Reese next argues that the trial court abused its discretion when it allowed the Oxygen Forensics report to be admitted at trial. He contends that the report should not have been admitted because Detective Darren Chandler ("Detective Chandler") did not meet the requirements for the admission of expert testimony under Indiana Evidence Rule 702. Specifically, Reese claims that the State failed to establish the foundation and reliability necessary to admit the report.

[32]     Reese failed to preserve this issue for appeal. At trial, Detective Chandler testified that he recovered a cell phone belonging to Randolph during the search of the garage at 3835 Spann Avenue, that he obtained a search warrant to conduct a forensic examination of the contents of the phone, and that he "hooked" the phone up to the Oxygen Forensics computer program to pull data from the phone. *Tr. Vol. 3* at 42. Detective Chandler then testified that data pulled from the phone showed that Randolph's phone contained contacts for "Justin," "Paul," and "Drake," along with their respective phone numbers. *Id.* at 43. Detective Chandler also stated that the phone had been activated on

April 3, 2017, and several days later, a Google search was performed searching for information about a home invasion in Putnam County. *Id*. at 43-44. Reese did not object to any of this testimony regarding the data obtained from the phone using the Oxygen Forensics program. *Id*. 42-44. He only objected when the State moved to admit the printed report containing the information about which Detective Chandler had already testified, contending that the State had failed to establish that the program was reliable or accurate. *Id*. 45-46. Therefore, at the time Reese objected, the information of evidentiary value from the report had already been admitted through Detective Chandler's testimony. A defendant must make a contemporaneous objection at the time the evidence is introduced to preserve a claim of evidentiary error for purposes of appeal. *Laird v. State*, 103 N.E.3d 1171, 1175 (Ind. Ct. App. 2018), *trans. denied*. Because he failed to do so, we conclude that Reese has waived this issue on appeal.

[33] Moreover, even if the admission of the Oxygen Forensics report was error, it was harmless. We will not reverse a conviction due to evidentiary error unless that error affects the substantial rights of the defendant. *Teague v. State*, 978 N.E.2d 1183, 1189 (Ind. Ct. App. 2012). An error is harmless if there is substantial independent evidence of guilt, and we are satisfied that there is no substantial likelihood the challenged evidence contributed to the conviction. *Id.*

[34] Substantial independent evidence was presented to establish that Reese committed the crimes for which he was convicted. Hours after the burglary was committed, a dually truck, which was the type of truck suspected of making the

tire tracks found in the McCarters' yard, was observed on surveillance footage entering the storage facility, where Reese had a storage unit, by using Reese's PIN code. *Tr. Vol. 2* at 193-95; *Tr. Vol. 3* at 11-14, 54. Reese was also seen on surveillance footage at the storage unit facility wearing clothing that matched the description of clothing worn by the men who committed the burglary. *Tr. Vol. 3* at 14-15, 85. Multiple items stolen from the McCarters' residence during the burglary were found inside of Reese's storage unit, including a blue tub containing Terry's tools, a money box, a wooden drawer from a piece of furniture, a clock, a box of several cameras, and mail addressed to the McCarters. *Id.* at 39, 47-50, 84-88. Only Reese and Hillenburg had access to the storage unit, and she testified that she had only been there about five times. *Id.* at 55, 61. When officers arrived to search the storage unit, Reese attempted to run over and flee from the officers, which showed consciousness of guilt. *Id.* at 24. After Reese's truck was stuck, he called his girlfriend during the ensuing standoff and told her he was going to kill himself because he had been caught. *Id.* at 73, 76. Reese's truck was searched when he was arrested, and one of Terry's stolen rifles was found in the backseat. *Id.* at 33-34, 83.

[35] Evidence was also presented that Reese stayed at 3835 Spann Avenue with Cherry, who was linked to the burglary through prints from his boots, and where police found items of clothing matching the description of those worn by the perpetrators as well as items stolen from the McCarters' home. *Tr. Vol. 2* at 214, 231-32, 235-37, 241, 246-47; *Tr. Vol. 3* at 71-72, 76. Furthermore, the McCarters' Buick Rendezvous was seen near and recovered from 3835 Spann

Avenue. *Tr. Vol. 2* at 210-11, 224. Reese had also given jewelry stolen from the McCarters to Hillenburg to pawn. *Tr. Vol. 3* at 55-56. Further, Reese confessed to his girlfriend that he was involved in the home invasion and discussed several items that they had stolen, including the Buick Rendezvous, jewelry, and a long gun. *Id.* at 75-76. Additionally, the challenged Oxygen Forensics report was mostly cumulative of other properly admitted evidence that Reese does not challenge on appeal. A cell phone belonging to Cosand was recovered during the search of 3835 Spann Avenue, and that phone was also searched and contained the same contact information for "Justin," "Drake," and "Paul" that was found on Randolph's phone. *Tr. Vol. 2* at 233; *Tr. Vol. 3* at 2. *See Hunter v. State,* 72 N.E.3d 928, 932 (Ind. Ct. App. 2017) ("The improper admission of evidence is harmless error when the erroneously admitted evidence is merely cumulative of other evidence before the trier of fact."), *trans. denied.* The Google search for a news story on the burglary by Randolph had no bearing on Reese's guilt. Based on the substantial independent evidence presented in support of Reese's convictions, we conclude that the admission of the Oxygen Forensics report, if error, was harmless.

## II. Sufficient Evidence

[36] Reese argues that the evidence presented at trial was insufficient to support his convictions. When we review the sufficiency of evidence to support a conviction, we do not reweigh the evidence or assess the credibility of the witnesses. *Lehman v. State,* 55 N.E.3d 863, 868 (Ind. Ct. App. 2016), *trans. denied.* We consider only the evidence most favorable to the verdict and the

reasonable inferences that can be drawn from that evidence. *Fuentes v. State,* 10 N.E.3d 68, 75 (Ind. Ct. App. 2014), *trans. denied.* We also consider conflicting evidence in the light most favorable to the trial court's ruling. *Oster v. State,* 992 N.E.2d 871, 875 (Ind. Ct. App. 2013), *trans. denied.* We will not disturb the verdict if there is substantial evidence of probative value to support it. *Fuentes,* 10 N.E.3d at 75. We will affirm unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Delagrange v. State*, 5 N.E.3d 354, 356 (Ind. 2014). A conviction can be sustained on only the uncorroborated testimony of a single witness, even when that witness is the victim. *Dalton v. State*, 56 N.E.3d 644, 648 (Ind. Ct. App. 2016), *trans. denied*.

[37] Reese first contends that the evidence was insufficient to support his convictions because neither of the McCarters could identify him as one of the perpetrators. He asserts that the four men who broke into the McCarters' home wore masks and gloves, and neither Terry nor Patsy could identify any of the four.

[38] Identity may be established entirely by circumstantial evidence and the logical inferences drawn therefrom. *Cherry v. State*, 57 N.E.3d 867, 877 (Ind. Ct. App. 2016), *trans. denied*. Identification testimony need not necessarily be unequivocal to sustain a conviction. *Id*. "When the evidence of identity is not entirely conclusive, the weight to be given to the identification evidence is left to the determination of the jury, as determining identity is a question of fact." *Harbert v. State*, 51 N.E.3d 267, 275 (Ind. Ct. App. 2016) (citing *Whitt v. State,* 499 N.E.2d 748, 750 (Ind. 1986)), *trans. denied*.

[39]     As previously stated, evidence was presented that the driver of a similar truck to that used in the burglary used Reese's PIN number to enter Reese's storage unit hours after the burglary, and numerous stolen items were discovered in that unit. Surveillance footage showed Reese wearing similar clothing to that of the perpetrators in the robbery shortly after the crimes occurred. One of Terry's stolen rifles was found in the backseat of Reese's truck. Reese stayed at 3835 Spann Avenue with the others implicated in the burglary, and items of clothing similar to those worn by the perpetrators and numerous stolen items from the burglary were found at that address. Reese gave jewelry stolen during the burglary to Hillenburg to pawn. Additionally, Reese's cell phone records showed that between 8:12 and 8:50 p.m., his cell phone traveled from Indianapolis to Greencastle, where the McCarters lived, his phone remained active in Greencastle until 3:22 a.m., and Reese traveled from Greencastle back to Indianapolis between 5:25 and 6:08 a.m. *Tr. Vol. 3* at 118-19; *State's Ex*. 133. Furthermore, Reese confessed that he was involved in the burglary to his girlfriend. Even though the McCarters were not able to identify Reese, sufficient evidence was presented to establish that Reese was one of the men who committed the burglary.

[40]     Reese next argues that the State failed to present sufficient evidence to support his convictions for conspiracy to commit burglary and conspiracy to commit armed robbery. Specifically, he asserts that insufficient evidence was presented to establish an agreement between him and Cherry, Randolph, or Drake to support a criminal conspiracy. Reese contends that none of the men testified,

and the only evidence of an agreement were phone calls between cell phones, which he maintains was not sufficient.

[41] Reese was convicted of both conspiracy to commit burglary and conspiracy to commit armed robbery. "A person conspires to commit a felony when, with intent to commit the felony, the person agrees with another person to commit the felony." Ind. Code § 35-41-5-2(a). The State must also prove that "the person or the person with whom he or she agreed performed an overt act in furtherance of the agreement." I.C. § 35-41-5-2(b). Therefore, in order to convict Reese of the two conspiracy charges, the State was required to prove that he agreed with Cherry, Randolph, or Drake to break and enter into the McCarters' home with the intent to commit theft or a felony inside and to take property from the McCarters by using or threatening the use of force while armed with a deadly weapon. I.C. §§ 35-43-2-1, 35-42-5-1.

[42] The State is not required to prove the existence of an express agreement, but there must be enough evidence to infer an agreement. *Purvis v. State*, 87 N.E.3d 1119, 1126 (Ind. Ct. App. 2017) (citing *Kemper v. State*, 35 N.E.3d 306, 310 (Ind. Ct. App. 2015), *trans. denied*). "'It is sufficient if the minds of the parties meet understandingly to bring about an intelligent and deliberate agreement to commit the offense.'" *Porter v. State*, 715 N.E.2d 868, 870-71 (Ind. 1999) (quoting *Williams v. State*, 274 Ind. 94, 96, 409 N.E.2d 571, 573 (1980)). The agreement may be proved by either direct or circumstantial evidence. *Id*. at 871. However, mere association with the co-conspirator, standing alone, is insufficient to support a conviction for conspiracy. *Id.*

[43]     Here, the men's actions upon entering the McCarters' residence showed that they had entered into an agreement to burglarize and rob the McCarters. Immediately after gaining entrance into the home by breaking the glass door, one man, while armed with a weapon, forced Terry to the ground, and the other three men then entered and began ransacking the house. One of those three men went to the bedroom, pointed a gun at Patsy, and told her, "You're going to be robbed." *Tr. Vol. 2* at 170. While these two men confined the McCarters, the other two men methodically went through the McCarters' home, garage, and barn, ransacking the area and taking numerous items. Afterwards, the men ordered both Terry and Patsy into the sunroom, and after threatening Patsy and hitting Terry in the head with a gun, the men locked the McCarters in the room and left. The actions of the men while in the McCarters' home showed that they had formulated a plan as to how to divide their efforts while in the home which supports the conclusion that there was an agreement between the men to commit the crimes of burglary and armed robbery.

[44]     Further, the cell phone records which were admitted at trial also supported this conclusion. Based on cell phone tower data taken from April 1, 2017 and the morning of April 2, when the burglary occurred, Reese, Cherry, and Drake traveled from Indianapolis to Greencastle in different intervals at various times in the evening. *Tr. Vol. 3* at 115-19; *State's Ex.* 133. The cell phone evidence also showed that there were communications between Reese and the other two men in the hours leading up to the burglary; the records showed that Cherry

and Drake had been communicating with one another and that Drake and Reese had been communicating with each other during that time period. *Tr. Vol. 3* at 125; *State's Exs.* 123, 126, 129. Based on the actions of the men while committing the burglary and armed robbery and the cell phone records, we conclude that the jury could infer that Reese had agreed with either Cherry, Randolph, or Drake to commit the crimes of burglary and armed robbery. Sufficient evidence was presented to support Reese's convictions for conspiracy to commit burglary and conspiracy to commit armed robbery.

## III. Double Jeopardy

[45] Reese argues that several of his nine convictions violate the prohibition against double jeopardy. The Fifth Amendment to the United States Constitution provides, "No person shall be subject for the same offence to be twice put in jeopardy of life or limb." Article 1, Section 14 of the Indiana Constitution sets forth that "[n]o person shall be put in jeopardy twice for the same offense."

[46] Under the federal constitution, multiple convictions will not be precluded if each statutory offense requires proof of an additional fact which the other does not. *Robinson v. State*, 835 N.E.2d 518, 522 (Ind. Ct. App. 2005) (citing *Blockburger v. United States,* 284 U.S. 299, 304 (1932)). The Indiana Supreme Court has developed a two-part test for Indiana double jeopardy claims, holding that two or more offenses are the "same offense" in violation of Article 1, Section 14, if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one

challenged offense also establish the essential elements of another challenged offense. *Sharp v. State*, 951 N.E.2d 282, 286 (Ind. Ct. App. 2011) (citing *Richardson v. State*, 717 N.E.2d 32, 49 (Ind. 1999)). Under the "statutory elements test," multiple convictions will not be precluded if each statutory offense requires proof of an additional fact which the other does not. *Id*. (citing *Robinson*, 835 N.E.2d at 522). We look only to the statutory elements of the offenses in making this analysis. *Id*. Under the "actual evidence test," the evidence presented at trial is examined to determine whether each challenged offense was established by separate and distinct facts. *Lee v. State,* 892 N.E.2d 1231, 1234 (Ind. 2008). To show that two challenged offenses constitute the "same offense," a defendant must demonstrate a reasonable possibility that the evidentiary facts used by the factfinder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense. *Sharp*, 951 N.E.2d at 287. "Application of this test requires the court to identify the essential elements of each of the challenged crimes and to evaluate the evidence from the factfinder's perspective." *Id.*

[47] Reese contends that his conviction for both Level 1 felony burglary and Level 2 felony burglary violate the double jeopardy prohibition. The State concedes that these two convictions were improper because Level 2 felony burglary is a lesser included offense of Level 1 felony burglary. *See* Ind. Code § 35-38-1-6 ("Whenever: (1) a defendant is charged with an offense and an included offense in separate counts; and (2) the defendant is found guilty on both counts;

judgment and sentence may not be entered against the defendant for the included offense.").

[48]     Reese also argues that his convictions for Level 2 felony conspiracy to commit burglary and Level 3 felony conspiracy to commit armed robbery violate double jeopardy under the actual evidence test because the two convictions rely on the same evidence. The State also concedes that Reese's convictions for both Level 2 felony conspiracy to commit burglary and Level 3 felony conspiracy to commit armed robbery violate the double jeopardy prohibition because at trial the State relied on same facts to establish both conspiracies.

[49]     When a double jeopardy violation has occurred, the "reviewing court may remedy the violation by reducing either conviction to a less serious form of the same offense if doing so will eliminate the violation." *Thompson v. State*, 82 N.E.3d 376, 383 (Ind. Ct. App. 2017) (citing *Richardson*, 717 N.E.2d at 54), *trans. denied*. However, if doing so will not eliminate the violation, one of the convictions must be vacated. *Id.* Reducing Reese's convictions will not eliminate the double jeopardy violations, so we must vacate Reese's convictions for Level 2 felony burglary and Level 3 felony conspiracy to commit armed robbery since they are the convictions with lesser penal consequences. Vacating these convictions and the corresponding sentences does not affect Reese's aggregate seventy-two-year sentence because the sentences for Level 2 felony burglary and Level 3 felony conspiracy to commit armed robbery were ordered to run concurrently with, and were lesser sentences than, the sentences for the Level 1 felony burglary conviction and the two Level 3 felony armed robbery

convictions, which are the three sentences that comprise the seventy-two-year aggregate sentence. *Appellant's App. Vol. 3* at 64; *Tr. Vol. 3* at 172.[14]

## IV. Inappropriate Sentence

Reese asserts that his seventy-two-year aggregate sentence is inappropriate. Pursuant to Indiana Appellate Rule 7(B), this court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the [c]ourt finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Our Supreme Court has explained that the principal role of appellate review should be to attempt to leaven the outliers, "not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). We independently examine the nature of Reese's offense and his character under Appellate Rule 7(B) with substantial deference to the trial court's sentence. *Satterfield v. State*, 33 N.E.3d 344, 355 (Ind. 2015). "In conducting our review, we do not look to see whether the defendant's sentence is appropriate or if another sentence might be more appropriate; rather, the test is whether the sentence is 'inappropriate.'" *Barker v. State*, 994 N.E.2d 306, 315 (Ind. Ct. App. 2013), *trans. denied*. Whether a sentence is inappropriate ultimately depends upon "the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad

---

[14] Reese also argues that his convictions for two counts of armed robbery and his conviction for conspiracy to commit armed robbery violate double jeopardy. However, this argument is rendered moot because we have vacated Reese's conviction for Level 3 felony conspiracy to commit armed robbery.

of other factors that come to light in a given case." *Cardwell*, 895 N.E.2d at 1224. Reese bears the burden of persuading us that his sentence is inappropriate. *Id*.

[51] Initially, we note that, although he argues that his aggregate sentence of seventy-two years executed is inappropriate because it constitutes a sentence for the "substantial balance of his life," *Appellant's Br*. at 38, Reese has not undertaken an analysis of why his sentence is inappropriate in light of the nature of the offense and his character as is required under Appellate Rule 7(B). He has therefore, waived this argument for failure to present a cogent argument. *Sandleben v. State*, 29 N.E.3d 126, 136 (Ind. Ct. App. 2015), *trans. denied*. Although Reese has waived is inappropriateness argument, we will proceed to address this issue on the merits.

[52] As this court has recognized, the nature of the offense is found in the details and circumstances of the commission of the offense and the defendant's participation. *Perry v. State*, 78 N.E.3d 1, 13 (Ind. Ct. App. 2017). Here, Reese and his co-conspirators broke and entered the home of the McCarters, who were both over the age of sixty-five, robbed them at gunpoint, destroyed their home, and stole multiple items. After ransacking the house, the perpetrators ordered the McCarters into the sunroom, where they threatened Patsy by pointing a gun at her head, and then hit Terry in the head with the butt of a gun, which caused severe injury that required surgery to relieve pressure on Terry's brain. The actions by Reese and his co-conspirators caused extensive damage to the McCarters' home. They ransacked the inside of the home,

destroying many pieces of furniture, paintings, and other items that they did not steal. Patsy testified that the furniture in their living room was covered in glass shards and had to be thrown away. *Tr. Vol. 2* at 178. The men stole Patsy's lifetime collection of jewelry, which included items of little monetary value but great sentimental value to her that can never be replaced because they were from her deceased mother. *Id.* at 170. The men also stole numerous other items and $6,000 in cash that will never be returned to the McCarters. Reese's crimes caused physical harm and significant financial loss to the McCarters as well as undermining their sense of security. We do not find that Reese's sentence is inappropriate in light of the nature of his offense.

[53] The character of the offender is found in what we learn of the offender's life and conduct. *Perry*, 78 N.E.3d at 13. When considering the character of the offender, one relevant fact is the defendant's criminal history. *Johnson v. State*, 986 N.E.2d 852, 857 (Ind. Ct. App. 2013). The evidence presented at the sentencing hearing showed that Reese has an extensive criminal history. His criminal activity began when he was a juvenile with adjudications for conversion, criminal mischief, and possession of marijuana. *Appellant's App. Vol. 4* at 5-6. As an adult, before committing the present crimes, Reese had been convicted of Class A misdemeanor resisting law enforcement, Class A misdemeanor possession of marijuana, and Class A misdemeanor invasion of privacy. *Id.* at 7-8. He also had convictions for Level 6 felony criminal recklessness committed with a deadly weapon and Level 6 felony domestic battery. *Id.* After he committed the instant offenses, Reese committed and was

convicted twice for Level 6 felony resisting law enforcement, Level 5 felony carrying a handgun with a felony conviction, and Class A misdemeanor unlawful possession of a firearm by a domestic batterer. *Id.* at 9. At the time of sentencing, Reese also had two pending cases, one where he had been arrested and charged with Level 2 felony dealing in methamphetamine, Level 3 felony possession of methamphetamine, Level 5 felony carrying a handgun with a felony conviction, and Level 5 felony possession of a narcotic drug, and one where he had been arrested and charged with Level 2 felony burglary with a deadly weapon, Level 3 felony robbery, Level 3 felony criminal confinement, Level 5 felony corrupt business influence, and Level 6 felony auto theft. *Id.* at 8-9. This criminal history shows that, rather than being deterred by his past interactions with the criminal justice system, Reese has continued to commit new crimes, many of which were still pending at the time he was sentenced in the present case. We do not find that Reese's sentence is inappropriate in light of his character. We, therefore, conclude that Reese's aggregate seventy-two-year sentence in not inappropriate.

[54] In conclusion, we find that the trial court did not abuse its discretion in admitting the evidence obtained as a result of the search warrant for Reese's cell phone records. We also conclude that, even if it was error for the trial court to admit the Oxygen Forensics report, it was harmless error. We also find that sufficient evidence was presented to establish that Reese was one of the men who committed the burglary and to support Reese's convictions for conspiracy to commit burglary and conspiracy to commit armed robbery. Reese's

convictions for Level 2 felony burglary and Level 3 felony conspiracy to commit armed robbery violated the double jeopardy prohibition, and we reverse those convictions and remand to the trial court to vacate. However, vacating those two convictions does not alter Reese's aggregate sentence of seventy-two years, and we do not find his sentence to be inappropriate in light of the nature of the offense and character of the offender.

[55] Affirmed in part, reverse in part, and remanded with instructions.

Vaidik, C.J., and Altice, J., concur.