

ATTORNEY FOR APPELLANT
LANDON T. HARBERT

Steven Knecht
Vonderheide & Knecht, P.C.
Lafayette, Indiana

ATTORNEY FOR APPELLANT
MALCOLM M. SMITH

Caroline B. Briggs
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Justin F. Roebel
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Landon T. Harbert and
Malcolm M. Smith,

*Appellants-Defendants,*

v.

State of Indiana,

*Appellee-Plaintiff*

February 4, 2016

Court of Appeals Case No.
79A02-1412-CR-874

Appeal from the Tippecanoe
Superior Court

The Honorable Thomas H. Busch,
Judge

Trial Court Cause Nos.
79D02-1302-FB-6
79D02-1302-FB-5

**Baker, Judge.**

Landon Harbert appeals his conviction for Robbery,[1] a class B felony, and the twenty-year sentence imposed by the trial court. Malcolm Smith, Harbert's co-defendant, appeals his convictions for two counts of Robbery,[2] a class B felony.

Harbert and Smith both raise the following arguments:

> (1) the trial court erred by denying the co-defendants' motion to dismiss the charges after a mistrial; and

> (2) there is insufficient evidence supporting the respective robbery convictions.

Harbert raises the following additional arguments:

> (1) the trial court committed fundamental error by admitting evidence of a statement made by Smith to police officers that Harbert insists implicated him in the underlying crimes; and

> (2) the twenty-year sentence is inappropriate in light of the nature of the offense and his character.

Finally, Smith argues as follows:

> (1) his right to due process was violated when he was not able to be present at certain pretrial hearings;

---

[1] Ind. Code § 35-42-5-1.

[2] *Id.*

(2) the trial court erred by denying his request for a continuance of the trial; and

(3) the trial court erred by denying his post-trial motion to correct error based on newly discovered evidence.

Finding no error, we affirm.

## Facts

[3] On October 23, 2012, two men robbed a money lending store located in a strip mall in West Lafayette. The first man, wearing dark or black clothing, a ball cap, and gloves, entered the store and stated he wanted to cash a check. As the store clerk began explaining the cash checking process, the second man, wearing dark, baggy clothing or a gray sweatsuit, entered the store and pulled a ski mask over his face. The first man, who was holding a small silver handgun, instructed the employee to do as the second man asked. The second man ordered the clerk to open her cash drawer and give him the money inside of it. She complied, giving the two men approximately $1500 in cash.

[4] During this altercation, a second clerk entered the store from the back and a customer entered from the front door. The man with the gun took a cell phone from the customer. The men ordered the two clerks and the customer into the store's back room. Eventually, the two men left and one of the clerks called 911.

[5] Outside, employees of an adjacent business observed two men enter a gray Dodge Durango with a breast cancer awareness license plate. The vehicle then

drove away at a high rate of speed. One of these witnesses described the men as wearing gray and black hooded sweatshirts.

[6] Responding police officers recovered the following items in nearby roadways within approximately a half of a mile of the robbery: a pair of high top sneakers, sweatpants, a hat, and a South Pole brand 5XL sweatshirt. The sneakers matched a description of the suspects' sneakers provided by one of the clerks. Inside the sweatpants was a wallet containing Smith's social security card and an Indiana Works identification card. A hair recovered from the pants contained Smith's DNA.

[7] Police were able to identify the Dodge Durango as a vehicle belonging to Kristin Harbert, who is Harbert's wife. When questioned by police about their whereabouts that day, Kristin and her friend, Megan Simpson, initially lied. Both women deleted their text messages from that day, and records show that some of those messages were to and from Harbert and Smith. When officers described the sweatshirt they had recovered, Simpson stated that Harbert owned that sweatshirt and that Kristin usually kept it in her vehicle. Eventually, Kristin and Simpson told police officers that they had gotten a call from Harbert's brother, Shawn, that day, indicating that the keys to Kristin's vehicle were in Indianapolis. Kristin and Simpson later retrieved the keys from a bush at a Steak 'n Shake restaurant. The Dodge Durango was later recovered in an impound lot near Smith's residence in Indianapolis and appeared to have been burned. One witness testified that she had seen Harbert driving a dark-colored Dodge Durango a few days before the robbery.

[8] Phone records for October 23, 2012, showed that Harbert's phone was near Lafayette in the morning, travelled to the east side of Indianapolis, returned to near Lafayette, and then returned to the east side of Indianapolis that afternoon. Smith's phone remained in Indianapolis during the time of the robbery, but records show calls between Smith and Harbert on the morning of the robbery and after the robbery. Also, records show calls between Smith and Harbert's brother, Shawn, on the night of the robbery. Additionally, phone records show calls and text messages between Smith and Simpson during the afternoon and evening after the robbery.

[9] Approximately one week after the robbery, West Lafayette Police Officer Troy Harris contacted Smith about the recovered wallet. Smith denied any involvement in the robbery. He told Officer Harris that he and Harbert had grown up together. Smith said that someone had stolen his wallet three or four weeks earlier around the same time he had last seen Harbert, Harbert's brother, and a group of other people who they had been with that day. Smith did not report the theft to the police. When Officer Harris stated that Smith's wallet was found at the scene of the robbery, Smith replied, "Well, that just told me something right there . . . Who the hell stole my wallet." Ex. 76RT at 5.

[10] On February 14, 2013, the State charged Harbert and Smith each with two counts of class B felony robbery and two counts of class C felony theft. In April 2013, the State added charges of class B felony conspiracy to commit robbery to each defendant and alleged that Smith was a habitual offender.

[11]   Before the first trial, the trial court granted a motion in limine barring evidence regarding the co-defendants' prior arrests. At the trial, which commenced in September 2013, Officer Harris testified regarding the way in which he identified the Dodge Durango:

> Harris:   . . . we started looking for a suspect vehicle that I thought I might be familiar with.
>
> State:   And you had the description of that vehicle?
>
> Harris:   I did, yes.
>
> State:   Okay. And had you recognized that vehicle?
>
> Harris:   I did recognize that vehicle.
>
> State:   As belonging to whom?
>
> Harris:   Krist[i]n Young [Harbert].
>
> State:   Okay. And did you acquire any information to verify that?
>
> Harris:   The reason I knew or had a suspicion that it belonged to Krist[i]n . . . is that the defendant Malcolm Landon [sic] had actually been arrested out of that vehicle . . . .

Tr. p. 287-88. Both defendants moved for a mistrial. In response, the prosecutor explained that he was attempting to elicit information about the

Durango's BMV records. The deputy prosecutor acknowledged that he had not specifically instructed Officer Harris to avoid mentioning the arrest, but explained that he did not believe such a warning was required due to "the nature of the case and the . . . [officer's] experience." *Id.* at 290. The trial court granted the mistrial.

[12] Before the second trial, both defendants moved to dismiss all charges on the basis of double jeopardy. The trial court denied the motion to dismiss. The second trial ended in another mistrial after the jury deadlocked.

[13] At a January 2014 status hearing, when the State confirmed its intentions to proceed with a third trial, the trial court informed Smith that he has a right to an appointed attorney if he could not afford to hire his own attorney. Smith indicated that he planned to hire an attorney. The trial court warned Smith that it would not allow the matter to "just linger on very long" and set another hearing in two weeks. *Id.* at 1186. At the next hearing, Smith stated that he had already selected an attorney, who would be in place by the end of February. Based on that representation, the trial court scheduled trial for June 2, 2014. On April 4, 2014, Smith told the court that his attorney would soon be appearing and that the attorney was aware of the trial date. The court warned Smith that the trial would go forward whether counsel had appeared or not. In early May 2014, the attorney had still not filed an appearance but Smith indicated that he had the money together to pay the retainer, so the trial court granted a trial continuance until August 4, 2014. On May 28, 2014, the private attorney told the court that he would not be representing Smith because Smith

had failed to pay him. At that time, the trial court appointed an attorney to represent Smith, leaving in place the August 2014 trial date. At some point following his appointment, Smith's attorney requested a continuance, which the trial court denied.

[14] On May 4, 2014, Harbert filed a pro se motion to sever the joint prosecutions.[3] The trial court denied the motion.

[15] The third jury trial took place on August 4-7, 2014. Following the trial, the jury found both defendants guilty as charged. On September 16, 2014, the trial court sentenced Smith to concurrent terms of twenty years imprisonment for each of the two counts of class B felony robbery.[4] The trial court also adjudged Smith to be a habitual offender and enhanced the sentence by ten years as a result, for an aggregate term of thirty years imprisonment. On November 25, 2014, the trial court sentenced Harbert to twenty years imprisonment for one count of class B felony robbery.[5] Both defendants now appeal.

---

[3] Eventually, the trial court appointed an attorney for Harbert and denied the remainder of Harbert's pro se motions as moot.

[4] The trial court vacated the convictions for theft and conspiracy to commit robbery.

[5] The trial court vacated Harbert's other convictions.

# Discussion and Decision

## I. Arguments Raised By Both Appellants

## A. Double Jeopardy

[16] Smith and Harbert argue that principles of double jeopardy required dismissal after the first mistrial. Both the United States and Indiana Constitutions forbid the State from placing a person twice in jeopardy. U.S. Const. amend. V; Ind. Const. Art. I, § 14. Retrial following a defendant's successful mistrial motion is only barred where the government's conduct is responsible for the defendant's mistrial motion. *Butler v. State*, 724 N.E.2d 600, 603 (Ind. 2000). The essential inquiry is whether the prosecutor brought about the mistrial motion; that is, whether the prosecutor acted with the intent to cause termination of the trial by provoking or goading the defendant into moving for a mistrial. *Willoughby v. State*, 660 N.E.2d 570, 576 (Ind. 1996). If the prosecutor acted with the requisite intent, then double jeopardy bars a retrial. *Wilson v. State*, 697 N.E.2d 466, 472 (Ind. 1998). These rules have been codified at Indiana Code section 35-41-4-3, which provides as follows:

> (a)    A prosecution is barred if there was a former prosecution of the defendant based on the same facts and for commission of the same offense and if:
>
> \*\*\*
>
> (2)    the former prosecution was terminated after the jury was impaneled and sworn or, in a trial by the court without a jury, after the first witness was sworn,

> unless (i) the defendant consented to the termination or waived, by motion to dismiss or otherwise, his right to object to the termination . . . .
>
> (b)      If the prosecuting authority brought about any of the circumstances in subdivisions (a)(2)(i) through (a)(2)(vi) of this section, with intent to cause termination of the trial, another prosecution is barred.

Here, because the defendants moved for mistrial, they are not entitled to relief under subsection (a). But they argue that they are entitled to relief under subsection (b) because the prosecutor, in eliciting the complained-of testimony from Officer Harris, acted with intent to cause termination of the trial.

[17]    We find our Supreme Court's opinion in *Willoughby* to be controlling. In *Willoughby*, the defendant requested and received a mistrial when a police officer made an improper reference to a polygraph examination when testifying. 660 N.E.2d at 575-76. The trial court permitted retrial and our Supreme Court affirmed, observing that there was no evidence that the prosecutor intended to cause the mistrial, that the prosecutor colluded with the officer to cause the mistrial, or that the officer knew his comments would likely cause a mistrial. *Id.* at 576.[6]

---

[6] To the extent that Smith argues that retrial should be prevented where a police officer testifies in a manner that goads a defendant to request a mistrial, we note that both *Willoughby* and Indiana Code section 35-41-4-3 refer only to the prosecutor. Moreover, there is no evidence in the record that, in fact, Officer Harris intended to goad the defendants into requesting a mistrial.

[18] In this case, as in *Willoughby*, there is no evidence that the prosecutor intended to cause a mistrial, that the prosecutor colluded with Officer Harris, or that Officer Harris knew that his comments would cause a mistrial. The prosecutor had not advised Officer Harris to refrain from testifying about the prior arrests, but did not believe that an advisement was necessary given the officer's professional experience. Moreover, the prosecutor was trying to elicit testimony regarding the vehicle's BMV records, rather than the prior arrests, in questioning Officer Harris. Under these circumstances, we find that the trial court did not err by denying the motion to dismiss the charges following the first mistrial.

[19] Harbert argues that he should be afforded greater protections by virtue of the Indiana Constitution. In support of this argument, he cites to Oregon's interpretation of an identical constitutional provision that bars retrial in cases where the prosecutor demonstrated indifference to mistrial or reversal. *State v. Kennedy*, 666 P.2d 1316, 1326 (Or. 1983). We decline to adopt the Oregon interpretation, but note that even if we did, it would not aid the defendants here. There is no evidence in the record that the prosecutor demonstrated indifference to mistrial or reversal. Consequently, this argument is unavailing, and we decline to reverse on this basis.

## B. Sufficiency

[20] Both appellants argue that the evidence is insufficient to support their convictions for class B felony robbery. When reviewing the sufficiency of the

evidence supporting a conviction, we will neither reweigh the evidence nor assess witness credibility. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009). We will consider only the evidence supporting the judgment and any reasonable inferences that may be drawn therefrom, and we will affirm if a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. *Id.*

[21] To convict Harbert and Smith of class B felony robbery, the State was required to prove beyond a reasonable doubt that they knowingly or intentionally took property from another person by using or threatening the use of force on any person, or by putting any person in fear, while armed with a deadly weapon. I.C. § 35-42-5-1.[7] Both Harbert and Smith contend that the State failed to prove beyond a reasonable doubt that they were the individuals who committed the robbery. It is well established that circumstantial evidence alone may be sufficient to sustain a conviction. *E.g.*, *Green v. State*, 808 N.E.2d 137, 138 (Ind. Ct. App. 2004). When the evidence of identity is not entirely conclusive, the weight to be given to the identification evidence is left to the determination of the jury, as determining identity is a question of fact. *Whitt v. State*, 499 N.E.2d 748, 750 (Ind. 1986).

[22] At the most general level, the appellants generally fit the physical descriptions provided by the eye witnesses: they are both Black men who are over six feet

---

[7] We cite to and apply the version of the robbery statute that was in effect at the time the alleged offenses were committed.

tall. The perpetrators were seen leaving the scene of the crime in a Dodge Durango that belonged to Harbert's wife. Harbert had been seen driving that vehicle a few days before the robbery. That same vehicle was found later that day, burned, a few miles from Smith's residence. Harbert and Smith are childhood friends, who have remained in touch through their adulthood.

[23] On streets within the vicinity of the robbery, law enforcement officers found "fresh" clothing that appeared to be recently discarded. Tr. p. 1333-35. The sweatpants found by the officers contained a hair with Smith's DNA as well as Smith's wallet containing his identification cards. The best friend of Harbert's wife identified the grey South Pole sweatshirt as belonging to Harbert; she further testified that the sweatshirt was usually kept in Kristin's Dodge Durango.

[24] Phone records established that Harbert's movements were consistent with the opportunity for both men to complete the robbery. Specifically, the phone moved as follows on October 23, 2013, the day of the robbery:

- In the early morning hours, the phone was in Lafayette.
- Around 9:50 a.m., the phone traveled to the north side of Indianapolis around 9:50 a.m., and ended up near Smith's house on the east side of Indianapolis at 10:19 a.m.
- The phone returned to Lafayette by 11:37 a.m. The timestamp on the surveillance video of the robbery indicates that the robbery occurred around 12:47 p.m.
- The cell phone returned to the east side of Indianapolis near Smith's home by 2:16 p.m.

The records for Smith's phone indicate no outgoing activity between 10:21 a.m. and 2:28 p.m. on that day, which would be consistent with Smith leaving his phone in Indianapolis while committing the robbery. Additionally, phone records show the following:

- Phone calls between Harbert and Smith before and after the robbery.
- Phone calls between Smith and Harbert's brother, Shawn, in the evening after the robbery.
- Phone calls and text messages between Smith and Kristin's friend, Simpson (who went with Kristin to retrieve Kristin's keys in Indianapolis) during the afternoon and evening after the robbery.

Simpson testified that she had never met Smith and was not familiar with his phone number. The evidence of the calls between Smith and Simpson supports the State's theory that Harbert was using Smith's phone to communicate with Kristin regarding retrieval of her keys after the robbery.

[25] Furthermore, the record reveals that Harbert had been regularly attending college classes through October 22, 2013, but he quit attending classes altogether the same day as the robbery. Although Smith stated that he had lost his wallet a few weeks before the robbery, he did not report his social security card or Indiana Works card as missing until after the robbery. Finally, Kristin and Simpson initially lied to police about their whereabouts on October 23, 2012, and both deleted text messages from their phones, which included text messages from Harbert and Smith. The jury could have reasonably inferred that the false statements and deleted texts were meant to protect Harbert.

[26]    Harbert argues that there is insufficient evidence supporting a conclusion that the Dodge Durango driven by the perpetrators was the same vehicle that belonged to his wife. We disagree, inasmuch as Officer Harris testified unequivocally that they were, in fact, the same vehicle. Moreover, the circumstances of Kristin's Dodge Durango going missing the same day as the robbery and ending up burned near Smith's house in Indianapolis readily support an inference that it was the same vehicle.

[27]    Smith argues that the State's evidence did not overcome his alibi defense. His alibi witness, however, did not testify unequivocally. The witness testified that he was unsure whether Smith was at his house on October 23, 2012, instead merely testifying that Smith was at his house most mornings. We find that the State's evidence did, in fact, overcome this alibi evidence. Smith also argues that the State failed to establish the time of the robbery, meaning that it could not have overcome his alibi evidence. We disagree. The surveillance video timestamp reveals that the robbery occurred at 12:47 p.m. on October 23, 2012. And in any event, Smith failed to support his alibi defense with any evidence showing his location *at any time* on October 23, 2012, meaning that the State needed to introduce only a modicum of evidence to refute the defense. We do not find Smith's alibi defense to be a compelling reason to overturn this verdict.

[28]    While all of the above evidence is circumstantial, as noted above, circumstantial evidence alone may sustain a conviction. And in this case, there is a wealth of circumstantial evidence indicating that Harbert and Smith were the individuals who committed the robbery. We find that as a whole, the jury

could have reasonably inferred from the above circumstantial evidence that Harbert and Smith committed the robbery, and decline to reverse on this basis.

## II. Harbert's Arguments

## A. Admission of Smith's Statement to Police

[29] Harbert argues that the trial court committed fundamental error when it admitted into evidence a statement made by Smith to police officers. Because Harbert did not object to the admission of this evidence, he must establish fundamental error to prevail, meaning that he must show that the trial court erred by not sua sponte raising the issue because the alleged error was a blatant violation of due process and presented an undeniable and substantial potential for harm. *Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014). Fundamental error will be found only in egregious circumstances. *Id.*

[30] Initially, we note that not only did Harbert's counsel not object to the admission of this evidence, she explicitly requested a limiting instruction—before the evidence was introduced—that Smith's statement could not be considered as evidence against Harbert.[8] The trial court agreed and provided the requested admonishment. Tr. p. 1463-64. At most, therefore, any error in the admission of this evidence was invited error, not fundamental error. *See Witte v. Mundy ex*

---

[8] Harbert argues that this was not invited error because counsel was merely trying to make the best of a bad situation by requesting the limiting instruction. But inasmuch as counsel had the opportunity to request a limiting instruction before the evidence was introduced, she also had an opportunity to object to its admission altogether. She did not do so. Therefore, any error in its admission was invited.

*rel. Mundy*, 820 N.E.2d 128, 133 (Ind. 2005) (holding that a party may not take advantage of an error that she invites).

[31] Waiver and invited error notwithstanding, we observe that the complained-of evidence consisted of a statement made by Smith to a police officer that someone had stolen his wallet three or four weeks earlier, around the last time he had seen Harbert, Harbert's brother, and "all the fellows that was with us that day." Ex. 75RT at 9-10. Smith later stated that if his wallet was found at the scene of the robbery, then the person who stole his wallet may be implicated. Ex. 76RT at 5.

[32] The United States Supreme Court has held that, in a joint trial, admission of one defendant's confession that implicates a co-defendant is a violation of the second defendant's Sixth Amendment right to confront witnesses. *Fayson v. State*, 726 N.E.2d 292, 294 (Ind. 2000). A statement implicates this rule if it "facially incriminates" another defendant. *Id.*

[33] Here, Smith's statement to the police does not facially implicate Harbert in the robbery. Indeed, it does not even suggest that Smith had any knowledge of the robbery. Instead, Smith reported that a few weeks before, his wallet had been stolen around the time he had spent time with Harbert, Harbert's brother, and some other individuals. He then suggested that whoever stole his wallet may be implicated in the robbery. Smith never, however, accused Harbert of stealing the wallet or of being involved in the robbery. We do not find that the admission of this evidence implicates the rule applied in *Fayson*, and we

certainly do not find that its admission constituted fundamental error. Therefore, we decline to reverse on this basis.

## B.  Appropriateness

[34]  Next, Harbert argues that the twenty-year sentence imposed by the trial court is inappropriate in light of the nature of the offense and his character.  Indiana Appellate Rule 7(B) provides that this Court may revise a sentence if it is inappropriate in light of the nature of the offense and the character of the offender.  We must "conduct [this] review with substantial deference and give 'due consideration' to the trial court's decision—since the 'principal role of [our] review is to attempt to leaven the outliers,' and not to achieve a perceived 'correct' sentence . . . ."  *Knapp v. State*, 9 N.E.3d 1274, 1292 (Ind. 2014) (quoting *Chambers v. State*, 989 N.E.2d 1257, 1259 (Ind. 2013)) (internal citations omitted).

[35]  Harbert was convicted of a class B felony, meaning that he faced a sentence of six to twenty years, with an advisory term of ten years.  Ind. Code § 35-50-2-5(a).  The trial court imposed a maximum twenty-year term.

[36]  As for the nature of the offense, Harbert victimized the owners of the store, the store employees, and the unlucky customer who walked in on the robbery.  He held them at gunpoint, greatly frightening them, and took the customer's cell phone.  After the robbery, he attempted to hide the crime from law enforcement by discarding his clothing and burning the vehicle.  We acknowledge that the

nature of the offense is not the worst of the worst, but must also consider Harbert's character in evaluating the sentence.

[37] Harbert has a significant criminal history. As a juvenile, he was twice adjudicated delinquent, and one of the adjudications was for child molestation. During his juvenile placements, he violated both probation and house arrest. As an adult, he has amassed a significant—and serious—criminal history, including a prior conviction for murder and, during the pendency of the litigation of the instant offenses, he was convicted of domestic battery, criminal mischief, false informing, and driving while suspended. Harbert admits to a history of drug use, including daily marijuana use at the time he committed the robbery. He also admits to many years of membership in the Gangster Disciples gang.

[38] While the nature of the offense may not be the worst of the worst, Harbert's character very nearly is. Harbert has been breaking the law since he was a minor. He even took another human life, and was released from incarceration with another chance to live his life in a way that refrained from hurting others and breaking the law. But despite the many opportunities he has been afforded to live a law-abiding life, he has continued to show a disrespect for the rule of law and his fellow citizens. Under these circumstances, we do not find the twenty-year sentence to be inappropriate in light of the nature of the offense and his character.

# III. Smith's Arguments

## A. Presence at Hearings

[39] First, Smith argues that he had a right to be present at Harbert's pretrial hearings. Specifically, Smith seems to focus on hearings related to a motion to sever the two defendants that had been filed by Harbert.

[40] Initially, we note that Smith raises this claim for the first time on appeal, meaning that he has waived it. *Washington v. State*, 808 N.E.2d 617, 625 (Ind. 2004). Moreover, the basis of Smith's argument appears to be that he would have joined in Harbert's motion to sever. But Smith, who was eventually represented by counsel, did not ever file his own motion to sever. Furthermore, there is no evidence that, had Smith been present at the hearings, the trial court would have granted severance.

[41] Waiver notwithstanding, we note that Smith has cited to no authority standing for the propositions that (1) he is entitled to appear in person at every hearing; and (2) he is entitled to appear in person at every hearing for a co-defendant. Instead, "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). Here, Smith has failed to establish that his presence would have contributed to the fairness of the hearings regarding Harbert's motion to sever. We also again emphasize that, in any event, Smith never even filed a motion to sever. We see no reason to conclude that Smith's presence at the hearings on

Harbert's motion was necessary to ensure the fairness of the process, nor that his absence hampered his ability to defend against the charges or hindered a fair and accurate determination of the issues at trial. We decline to reverse on this basis.

## B.  Motion to Continue

[42]    Next, Smith argues that the trial court erred by denying his motion to continue the trial. The denial of a non-statutory request for a continuance is committed to the trial court's discretion, and we will reverse only for an abuse of that discretion. *Maxey v. State*, 730 N.E.2d 158, 160 (Ind. 2000). Requests for continuances are not generally favored and will be granted only in the furtherance of justice on a showing of good cause. *Clark v. State*, 539 N.E.2d 9, 11 (Ind. 1989).

[43]    Here, the timeline leading up to trial was as follows:

- At a January 2014 status hearing, the trial court informed Smith that he had a right to an appointed attorney. Smith indicated he planned to hire one, and the trial court warned Smith that it would not allow the matter to "just linger on very long." Tr. p. 1186.
- At the next hearing, Smith represented that he had selected an attorney, who would be in place by the end of February. The trial court scheduled trial for June 2, 2014.
- On April 4, 2014, Smith told the trial court that his attorney would soon be filing his appearance. The trial court warned Smith that trial would proceed whether counsel had appeared or not.
- In early May 2014, the attorney had still not filed an appearance. Smith told the court that he had raised the money to pay the attorney's retainer. The trial court granted a continuance of the trial until August 4, 2014.

- On May 28, 2014, the attorney told the trial court that he would not be representing Smith because Smith had not paid him. At that time, the trial court appointed an attorney to represent Smith.
- The appointed attorney requested a continuance, which the trial court denied, and trial took place as scheduled beginning August 4.

For months, Smith delayed, despite the trial court's caution that trial would proceed as scheduled and the trial court's statement that an attorney would be appointed for Smith if he could not afford to hire one. And even though the trial court was reluctant to continue the matter, it granted one continuance based upon Smith's representation that he had finally raised the money to retain an attorney.

[44] Had Smith not delayed for so long, his appointed attorney would have had much more time to prepare for trial. But even at the late date of the appointment, trial counsel still had two months to prepare. Smith provided no compelling examples of how additional time would have benefited his defense. *See Clark*, 539 N.E.2d at 11 (holding that a defendant must make a specific showing that additional time requested would have aided him in order to show that the trial court abused its discretion in denying motion to continue). Smith directs our attention to a defense that was not raised at trial, but does not explain why this defense could not have been prepared in the two months provided. Given Smith's own delays and the lack of a showing that additional time would have benefited his defense, we do not find that the trial court abused its discretion in denying his motion to continue the trial.

# C. Motion to Correct Error

[45] Finally, Smith argues that the trial court erred by denying his post-trial motion to correct error based upon newly-discovered evidence. A trial court is vested with the discretion to deny a motion to correct error alleging newly-discovered evidence, and we will reverse only for an abuse of that discretion. *Bradford v. State*, 675 N.E.2d 296, 302 (Ind. 1996); *see also* Ind. Trial Rule 59 (governing motions to correct error).

[46] Motions for a new trial based on newly-discovered evidence are generally disfavored. *Denney v. State*, 695 N.E.2d 90, 93 (Ind. 1998). To succeed, the defendant must satisfy a nine-part test, submitting proof that establishes:

> (1) that the evidence has been discovered since the trial; (2) that it is material and relevant; (3) that it is not cumulative; (4) that it is not merely impeaching; (5) that it is not privileged or incompetent; (6) that due diligence was used to discover it in time for trial; (7) that the evidence is worthy of credit; (8) that it can be produced upon a retrial of the case; and (9) that it will probably produce a different result.

*Id.* The defendant bears the burden of showing that the newly discovered evidence meets all nine requirements. *Godby v. State*, 736 N.E.2d 252, 258 (Ind. 2000).

[47] Here, the newly discovered evidence consisted of media reports of three robberies occurring at Lafayette gas stations and a Lafayette check cashing business in October and November 2014. We do not find that this is "evidence" that is "worthy of credit" or that it could be produced on retrial.

Instead, these unsubstantiated media reports constitute an attempt by Smith to seek aid from the court to conduct discovery in the hope that he would eventually find exculpatory evidence. But the motion to correct error standard requires that, to be entitled to a new trial, the defendant must already have the creditable, producible evidence on hand. Smith does not meet this test.

[48] Furthermore, we note that the unsubstantiated media reports indicate that the suspect identified in the gas station robberies is not the same ethnicity as either appellant, nor does it match the description of the perpetrators provided at trial. And the check cashing robber was reported to be significantly shorter than Smith. Therefore, even if we were to find that this evidence is worthy of credit and producible, we would not find that it would probably produce a different result on retrial. In sum, we do not find that the trial court abused its discretion by denying Smith's motion to correct error.

[49] The judgment of the trial court is affirmed.

Bradford, J., and Pyle, J., concur.