FILED
May 15 2025, 9:37 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



I N  T H E

# Court of Appeals of Indiana

Hakim Zamir Lamar Qualls,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

---

May 15, 2025

Court of Appeals Case No.
24A-CR-131

Appeal from the
LaPorte Superior Court

The Honorable
Jaime M. Oss, Judge

The Honorable
Michael S. Bergerson, Judge

**Opinion by Senior Judge Robb**
Judges Mathias and Scheele concur.

**Robb, Senior Judge.**

## Statement of the Case

[1] Hakim Zamir Lamar Qualls was tried for Murder and Class A misdemeanor dangerous possession of a firearm. The trial ended in a mistrial. After first denying it, the trial court later granted the State's request to amend the information to add one count each of Level 1 felony attempted murder, Level 3 felony aggravated battery, and Level 5 felony criminal recklessness to the original charges. The State retried Qualls, who appeals from his convictions after a jury trial of Level 3 felony aggravated battery and Class A misdemeanor dangerous possession of a firearm. Qualls raises several issues for our review, the following of which are dispositive in this appeal:

    I.      Whether the federal and state double jeopardy clauses bar Qualls' retrial; and

    II.    Whether the State rebutted the presumption of prosecutorial vindictiveness after adding charges immediately after the mistrial was declared.

For reasons we fully explain below, we reverse and remand to vacate Qualls' convictions.

## Facts and Procedural History

### A. The Conflict

In the last two months of 2018, sixteen-year-old Qualls was pursued by Dareon Brown, a gang member two years older than Qualls, who was also known as Romo. Qualls, who worked at McDonald's, lived with his friend, Marquavion, and his family after becoming homeless. Marquavion also worked at McDonald's.

At around 10 p.m. one night in November 2018, Brown's brother, Javan, also known as J Dot, and Javan's friend, Donald Deal, arrived at McDonald's to confront Marquavion for "talking trash." Tr. Vol. 6, p. 221. Qualls had experience in boxing and established the ground rule that the two could not "jump" Marquavion while they fought in the alley. *Id.* at 221. When Javan seemed to be winning the fight, Qualls stepped in and pulled the two apart. At some point, Marquavion walked away from the alley, saying he could not see well in the dark and refusing to fight in that location. The other two encouraged him to return to fight, and it was at that time that Dareon arrived.

Dareon shouted to Marquavion to return to the alley or they would all fight him. When Qualls reiterated that no one could jump Marquavion, Dareon took offense and began fighting Qualls. Dareon's brothers broke up the fight, and he and the others fled the scene. Unbeknownst to Qualls, Brown's friends

had recorded the fight between him and Qualls and uploaded the video to social media. People commenting about the video stated that it looked like Qualls had won the fight.

[5] The following Sunday, a car stopped beside Qualls as he was walking to work. Brown exited from the passenger's side of the vehicle, and Brown's friend, Wayne, exited the driver's side. Wayne moved towards Qualls in a fighting stance. Meanwhile, Brown accused Qualls of telling people he had won the fight. Believing he was going to be jumped Qualls also took up a fighting stance and feigned a step toward Wayne. In response, Brown flashed a gun that he had concealed in his coat.

[6] When Qualls saw the gun, he turned to run, but Brown tripped him. After Qualls fell to the ground, Brown and Wayne repeatedly punched and kicked him while he curled up in a fetal position. They continued to beat Qualls until an approaching vehicle caused them to return to their car and leave.

[7] Qualls found a place to hide until he thought it was safe to walk home. However, as Qualls crossed a bridge he saw Wayne's vehicle approaching. Qualls jumped over the railing to hide. Brown exited the vehicle with his gun drawn and pointed it at Qualls. Brown fired shots at Qualls as he ran toward a wooded area.

[8] Qualls ran home. Lovie Nixon, Marquavion's grandmother, was home when Qualls entered the house. She testified at trial that he appeared scared, his clothes were torn, he was missing his backpack and a shoe, and he had several

marks on his body from running through the brush. Nixon decided to intervene and speak with Brown's mother after learning that the conflict had escalated to the use of guns. Nixon and her husband called Brown's mother Krystal Ashley. Ashley is the niece of the Assistant Chief of Services for the Michigan City Police Department Jillian Ashley, an investigator in the charges against Qualls.

[9] Qualls began carrying a borrowed gun on his walk to work and prepared himself to use it should Brown draw a gun on him again. Brown and his friends began intimidating him at work. He told his manager about the situation, and the disruption was such that Qualls was forced to move from taking food orders to working in the kitchen. Eventually, Qualls bought a silver revolver and four bullets from an individual who had heard about the conflict.

[10] Qualls carried his loaded revolver on his walk early in the morning on December 18, 2018. He was listening to music and walking along Karwick Street when he passed CJ Rouse's house. Rouse was a known, local drug dealer. Brown had backed his car into the driveway of the house next door to Rouse's. Brown's girlfriend, Aubree Kolasa, remained in the car while Brown completed a drug deal with Rouse. Qualls glanced up and saw Rouse walk around the car and back to his porch, leaning back with folded arms, watching Qualls. Qualls did not recognize the vehicle or see the passengers. He removed his headphones because he believed Rouse wanted to talk with him.

[11] Qualls passed in front of Brown's car before reaching Rouse's house. He heard a car door shut and then saw Brown stepping out in a crouched position from

the driver's side of the vehicle. Brown asked, "[W]hat's up, son?" Tr. Vol. 7, p. 46. As he did so, he had his gun drawn and pointed at Qualls. Instead of running, Qualls drew his revolver. Brown then began to fire and Qualls returned fire. Brown stumbled and began to fall. Qualls moved to grab Brown's gun from his hand. As he did so, he twisted it inward and pulled. The gun went off once as Qualls ripped it from Brown's hand, disarming him. That shot struck Brown in the arm and grazed his head.

[12] Brown fell backward and landed in a seated position. Qualls took both guns and ran into the woods. Brown had been armed with a 9-mm semiautomatic firearm with a cartridge loaded with hollow-point bullets. Kolasa drove Brown to the hospital and identified Qualls as the shooter. Brown died from his wounds, and Qualls was subsequently found in possession of both guns.

## B. The Charges and First Trial

[13] On December 20, 2018, the State charged Qualls with murder and Class A misdemeanor carrying a handgun without a license. The State was allowed to amend the charge of carrying a handgun without a license to Class A misdemeanor dangerous possession of a firearm. Qualls filed a notice of intent to use the defense of self-defense.

[14] Qualls' first jury trial began on December 16, 2019. The State acknowledged Qualls' self-defense claim in its opening statement but argued that Qualls seized upon an opportunity for revenge against Brown. During Kolasa's testimony, she admitted that she had given multiple false statements to the police.

Ultimately, she testified that Brown also had a gun on the day of his death. She said she heard three or four shots and that the last shot sounded different. Qushawn Tyler, who was playing video games inside Rouse's home, testified that he heard four gunshots and that he believed Brown had a gun because he heard two distinct sounds during the gunfire.

[15] Assistant Chief of Services for the Michigan City Police Department Jillian Ashley testified. She was a detective with the department at the time of Brown's death. As a corporal, she held a supervisory position within the department. And she had trained the lead investigator in the case, Detective Arwen LaMotte. After meeting with other investigators in the case, Detective Ashley and Detective Kay Pliske interviewed the residents of the home where Qualls was apprehended and collected the clothing Qualls had left there.

[16] Detective Ashley was Brown's great-aunt. On direct examination she agreed that she knew Brown personally, that she knew Brown's mother, Krystal Ashley, and that they were all in attendance at family functions. On cross-examination, Detective Ashley testified that she did not think it was inappropriate for her to be involved in assisting with the investigation into her great-nephew's death. When asked if she was aware that Kolasa had given inconsistent statements to police, ultimately disclosing that Brown had a gun with him on the day of his death, she responded that she did not know anything about a self-defense claim being asserted and did not investigate it. More specifically, the questions and answers were as follows:

> Q: [D]o you think it was a bad idea that you would be involved in an investigation of the death of your nephew when there was a claim of self-defense?
>
> A: I don't know anything about a claim of self-defense and nor do I believe that it was a bad idea for me to assist with an investigation.
>
> Q: You're telling me you did not know by 12/28 or 12/19 that there was a claim of self-defense?
>
> A: A claim of self-defense?
>
> Q: Yes.
>
> A: No.
>
> Q: You didn't know by 12/19 that Aubree Kolasa had given at least three statements and ultimately told the police on 12/18 that your nephew had a gun.
>
> A: That who said that? I'm sorry?
>
> Q: Your nephew had a gun.
>
> A: I don't know anything about what – I mean, what are you saying that it was a matter of self-defense? Do I know anything about that? No. Normally when we get self-defense, it is based on the defendant's statement. We did not get a statement, is my understanding.

Tr. Vol. 3, pp. 95-96.

[17] Qualls' counsel moved for and the trial court granted a mistrial on December 17, 2019. The court acknowledged the violation of the motion in limine[1] and

---

[1] Motion In Limine #7 stated in pertinent part: "The Defendant, Hakim Zamir Lamar Qualls, by counsel, Elizabeth Flynn, respectfully requests this Court to enter an Order requiring the State, by the prosecuting attorney, to refrain from mentioning in the presence of the jury during voir dire, opening argument, presentation of evidence, and closing argument, any and all references to the following, either directly or indirectly:

> 1. Any reference to the fact that the Defendant did not testify at the trial of this cause and that he remained silent during questioning by law enforcement officers during any stage of these proceedings. *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.E.2d 106 (1985); *Dooley v.*

violation of Qualls' Fifth Amendment right to remain silent. The State conceded that it had not sent a copy of the motion in limine to Detective Ashley but contended Qualls had opened the door to the violation through a heated exchange with the witness. In granting the mistrial, the court accepted that the exchange between counsel and the witness was heated, but noted that Detective Ashley was a seasoned police officer who was related to Brown, and that as such, when she volunteered that Qualls had not made a statement, "it just further complicates" the issue. *Id.* at 103. And the court cited the violation of a fundamental right.

[18] Immediately after the ruling from the bench, Qualls' counsel argued, "I believe that a mistrial granted while the jury is seated prevents the retrial of the case." *Id.* at 104. The State countered that it did not invite the error, but reasoned that the defendant elicited the volunteered statement through cross-examination. The court declined to rule on the propriety of a retrial at that time. Instead, the court set a new trial date for January 27, 2020 and advised counsel to file any motion relating to the propriety of the retrial or any other relief they might request for review. Qualls was released to community corrections with GPS monitoring and the court issued a no-contact order for the victim's family.

---

*State*, 393 N.E.2d 154 (Ind. 1979); *Miller v. Lockhart*, 65 F.3d 676 (8th Cir 1995); *Doyle v. Ohio*, 426 U.S. 610 (1976).

Appellant's App. Vol. 2, p. 57. The trial court entered its order in limine on December 9, 2019. *Id.* at 64.

## C. Motions

[19] The State moved to file an amended information to add one count of Level 1 felony attempted murder and one count of Level 3 felony aggravated battery to the previous charges the same day the mistrial was granted, December 17, 2019. The bases for adding the charges was information learned during opening statements and witness testimony plus physical evidence from Brown's autopsy.

[20] On January 9, 2020, Qualls filed his objection to the State's motion to amend. Qualls first raised statutorily based arguments against amendment. He asserted that the amendment was untimely because it was not filed before the omnibus date and starting date of the first trial. He further argued that the State had provided no authority for the right to amend after a mistrial and before Qualls' second trial. And he claimed that he would be prejudiced by having less than thirty days in which to prepare a defense against the new charges.

[21] Qualls further challenged the amendment, arguing that the mistrial was caused by the State's witness' testimony and that the State should not be allowed to benefit from its misconduct. He noted that the State admittedly had not provided the motion in limine to Detective Ashley. And, even so, the detective had enough experience to have known not to comment on Qualls' choice to remain silent.

[22] He also questioned that the State's argument about learning new information during Qualls' opening statement and through witness testimony was a valid basis for amending the charges. He contended that the State was in possession

of the physical evidence from the beginning of the case and that the only other information the State discovered was Qualls' defense strategy. He argued that amendment of the charges after learning Qualls' defense strategy would be prejudicial to him.

[23] On January 10, 2020, Qualls filed a motion to dismiss the charges against him because a retrial violated double jeopardy principles under the federal and state constitutions. Qualls reiterated his challenge to the State's argument that it should be allowed to amend the charges based on evidence it learned during his counsel's opening statement.

[24] The court held a hearing after which it held that although the Double Jeopardy clause does protect Qualls from improper conduct by the State to provoke a mistrial, the State could not be held responsible for Qualls' counsel's choice to "pursue repeated, inaccurate questions on cross-examination into this topic of self-defense." Appellant's App. Vol. 2, p. 172. The court held that the State took no action with the intent to cause the mistrial. The court further held that the State's failure to advise Detective Ashley about the motion in limine was not designed to cause a mistrial. The court found that Qualls invited the error, and the court denied his motion to dismiss the charges. The court also denied the State's motion to amend the charging information.

[25] The record reflects that the January 27, 2020 trial date was cancelled. And Qualls later asked and the court granted his request to certify the matter for interlocutory appeal. After certification, this Court denied Qualls' request that

we accept jurisdiction of the interlocutory appeal on April 2, 2020. Qualls' new trial date was set for May 7, 2020.

[26] On April 10, 2020, the State filed another motion to amend the charging information to add counts of Level 1 felony attempted murder, Level 3 felony aggravated battery, and Level 5 felony criminal recklessness. This time, the State explained that the criminal recklessness charge was based on evidence discovered during further investigation conducted after the mistrial. As for the other two counts, the State argued that the amendment was based on evidence presented by Qualls in the first trial and that they are inherently lesser-included offenses, instructions on which they would be entitled to at trial. Qualls argued that they were based on separate facts and as such were not inherently included in the murder charge. He reiterated his argument that the evidence was not new. After finding that the State's motion to amend was not vindictively filed, the court granted the State's motion to amend.

## D. Retrial

[27] At Qualls' retrial several witnesses changed or altered their testimony. Tyler testified that while he was inside Rouse's house he heard two or three gunshots, instead of the four to seven gunshots he had testified about during the mistrial. And he did not testify about hearing shots from two distinct types of guns. In fact, on cross-examination, Tyler denied that he heard two different sounds. But he was not impeached by his prior statements. Kolasa testified that she saw Qualls approach with his gun drawn, and after she heard gunshots, she saw Brown fall as he turned to run. After she ducked down she saw Qualls

approach and take something. Then she heard another round of gunshots and saw Qualls run into the woods. And Detective Ashley denied personally knowing her great-nephew Brown. She did acknowledge knowing Brown's mother because she was her husband's niece. Dr. Feczko, the forensic pathologist, testified during the retrial that the bullet that entered Brown's back hit his spine and that most spinal injuries, like Brown's, are "most likely" debilitating and probably caused paralysis. Tr. Vol. 6, p. 73. On cross-examination, Dr. Feczko testified that he was certain that the spinal injury caused paralysis because of his experience. When questioned about his deposition testimony from 2019 where he testified it was "possible" that the gunshot wound to the back caused paralysis, Feczko testified that he had performed twice as many autopsies since then and had acquired additional knowledge.

[28] Qualls testified that Brown pointed his gun at Qualls when Brown exited the vehicle. Qualls stated that Brown began firing at him when he pulled his gun out of his pocket. He testified that he did return gunfire and that when Brown fell, he grabbed Brown's gun. Qualls said Brown's gun discharged one time as he was grabbing it from Brown, wounding Brown's arm and grazing his head. Qualls maintained he acted in self-defense.

[29] The jury found Qualls guilty of aggravated battery and dangerous possession of a firearm and not guilty of the remaining charges. The trial court sentenced Qualls to nine years for aggravated battery and one year for dangerous possession of a firearm, with the sentences to be served concurrently.

# Discussion and Decision

## I. Double Jeopardy

[30] Qualls argues that the trial court erred by denying his motion to dismiss on the ground that his retrial violates double jeopardy principles. Both the United States and Indiana Constitutions forbid the State from placing a person twice in jeopardy. U.S. Const. Amend. V; Ind. Const. art. I, § 14. "Retrial following a defendant's successful mistrial motion is only barred where the government's conduct is responsible for the defendant's mistrial motion." *Harbert v. State*, 51 N.E.3d 267, 274 (Ind. Ct. App. 2016), *trans. denied*.

[31] This concept was codified in Indiana Code section 35-41-4-3(b) (1977), which provides that "[i]f the prosecuting authority brought about any of the circumstances [enumerated in (a)(2) of the statute] with intent to cause termination of the trial, another prosecution is barred." Those enumerated circumstances in (a)(2) include "(i) the defendant consented to the termination or waived, by motion to dismiss or otherwise, his right to object to the termination, (ii) it was physically impossible to proceed with the trial in conformity with law, (iii) there was a legal defect in the proceedings that would make any judgment entered upon a verdict reversible as a matter of law, (iv) prejudicial conduct, in or outside the courtroom, made it impossible to proceed with the trial without injustice to either the defendant or the state, (v) the jury was unable to agree on a verdict, or (vi) false statement of a juror on voir dire prevented a fair trial." I.C. § 35-41-4-3(a)(2).

[32] "The subjective intent of the prosecutor is the dispositive issue." *Butler v. State*, 724 N.E.2d 600, 603 (Ind. 2000). "Although a trial court's determination of prosecutorial intent is not conclusive for purposes of state appellate review, we do regard its determination as 'very persuasive.'" *Id.* at 603-04 (quoting *Wilson v. State*, 697 N.E.2d 466, 473 (Ind. 1998)). "It is a factual determination that we review under a clearly erroneous standard." *Butler*, 724 N.E.2d at 604.[2]

[33] The trial court's initial reaction when granting the mistrial summed up the situation best.

> Outside of the hearing of the Jury, the Defendant verbally moves for a Mistrial. Submitted. Argument heard. The Court finds as follows:
>
> - Detective Ashley's response was elicited in the course of heated cross examination by the Defendant's counsel, and that the witness was doing her best to respond in a way that would answer the same question for the third time.
>
> - The problem here is of course, had the response [sic] that Detective Ashley did not have any information related to the assertion of a self-defense claim, would have been okay. The additional comment that normally she would be aware of a

[2] In *Willoughby v. State*, 660 N.E.2d 570, 576 (Ind. 1996), the Supreme Court applied an abuse of discretion standard. ("On appeal, the decision of the trial court [about the prosecutor's intent to cause a mistrial] will be reversed only for an abuse of discretion."). However, in *Etter v. State*, 56 N.E.3d 53, 57 (Ind. Ct. App. 2016), *trans. denied*, a panel of this Court held that where the special judge made his ruling on a paper record, having not been present at the first trial, our review is de novo. In this case, as in *Butler*, the same judge was present during the mistrial, made findings regarding the prosecutor's intent, and ruled on the subsequent motion to dismiss. Therefore, we adhere to *Butler*'s clearly erroneous standard of review coupled with the concept that the court's determination is "very persuasive" but not dispositive.

claim of self-defense if it was based on the statement of a Defendant goes a bit closer to a violation of the Defendant's Motion in Limine #7. . . . And she then mentioned that, "*We did not get a statement from the Defendant it is my understanding.*" Those are her words.

- Certainly a violation of the Defendant's Motion in Limine No. 7.

- Further complicating the situation here is that the witness is a relation to the decedent.

- The Defendant's Fifth Amendment Rights [sic] to Remain Silent is a fundamental right.

- It is hard to think that the testimony of Detective Ashley is not going to be commented upon and discussed by this Jury. I think it puts the Defendant in great peril, and the Court GRANTS the Defendant's Motion for a Mistrial.

Appellant's App. Vol. II, pp. 78-79 (December 17, 2019 Order).

[34]   But the court's order denying Qualls' motion to dismiss held as follows:

The Double Jeopardy clause does protect the Defendant from improper conduct by the State designed to provoke a mistrial, but that is not what happened here. While Det. Ashley was a State's Witness, the State cannot be held responsible for the Defendant's choice to pursue repeated, inaccurate questions on cross-examination into this topic of self-defense.

The State took no part in goading the witness to respond in such a way, nor did the State goad the Defense into asking for a mistrial. The State took no action whatsoever with intent to

cause termination of the trial which began on December 16, 2018.

In addition, the Defendant has not established that the State's failure to advise the witness of the Order on the Motion in Limine was designed to cause a mistrial. No such evidence was established and if anything, it was the Defendant who invited the error and cannot now be heard to complain.

*Id.* at 172-73.

[35] The State contends that under the facts of this case, the trial court correctly denied the motion to dismiss because Qualls, through his questioning of Detective Ashley, brought about the termination of his first trial. The State also offers that our focus should be on "'whether the prosecutor acted with the intent to cause termination of the trial by provoking or goading the defendant into moving for a mistrial.'" Appellee's Br. p. 21 (quoting *Harbert*, 51 N.E.3d at 274).

[36] But the cases cited by the State are distinguishable from the present case. In *Willoughby v. State*, 660 N.E.2d 570 (Ind. 1996), State's witness Officer William Jones was asked by the State about where an interview with a suspect in a murder case took place. The officer responded, "I'd gone to Paula Willoughby's house to inform her of our previous arrangement for her to take a polygraph test." *Id.* at 575. The trial court granted the defendant's request for mistrial based on the reference to a polygraph test, and the appellate issue was whether the defendant could be retried. Our supreme court found that the

officer's answer was not what the prosecutor likely anticipated, there was no evidence in the record of collusion between the prosecutor and the officer, no evidence that the officer intended to cause a mistrial, or that he knew that the mention of the word polygraph would likely cause a mistrial. *Id.* at 576.

[37] In *Harbert*, an order in limine prevented witnesses from testifying about the co-defendants' prior arrests. The State asked the officer if he acquired any information to verify that the vehicle used in the crime belonged to a co-defendant's wife. The officer responded that "[t]he reason [he] knew or had a suspicion that it belonged to [the co-defendant's wife] . . . is that the defendant Malcom Landon [sic] had actually been arrested out of that vehicle . . . ." 51 N.E.3d at 272-73. Both defendants moved for a mistrial. The State acknowledged that it had not instructed the officer to avoid mentioning the arrest but did not think it was necessary given the officer's experience and the nature of the case. The trial court granted the mistrial. Before the retrial the defendants moved to dismiss the charges on double jeopardy grounds. The second trial ended in a mistrial after the jury was deadlocked. The third trial resulted in a conviction. A panel of this Court, relying on *Willoughby*, held that there was no evidence that the prosecutor intended to cause a mistrial, that the officer and prosecutor colluded, or that the officer knew his comments would cause a mistrial. *Id.* at 274-75.

[38] In the present case, the officer was related to the victim. She testified that she was unaware of a self-defense claim after having been involved in war room discussions with other detectives in the case. She did not pursue an

investigation along those lines and did not suggest other detectives under her supervision had investigated along those lines. Additionally, the State failed to inform her of the order in limine prohibiting her from discussing Qualls' decision to remain silent.

[39] The State also contends that Qualls' argument cannot prevail because Detective Ashley was under intense cross-examination by the defense before making the comment precipitating the mistrial. The State reiterates that our focus should be on the conduct of the prosecutor, which did not cause the comment or testimony that necessitated a mistrial. *See e.g., Harbert,* 51 N.E.3d at 274 (central inquiry is "whether the prosecutor acted with the intent to cause termination of the trial by provoking or goading the defendant into moving or a mistrial."); *Butler*, 724 N.E.2d at 603 ("The subjective intent of the prosecutor is the dispositive issue."); *Willoughby*, 660 N.E.2d at 576 (retrial proper because "the trial court specifically found that 'the state didn't intentionally cause a mistrial.'"). While we do not disagree with the holdings of those cases and others which reach similar conclusions, we note some distinct differences which lead us to decide this case differently.

[40] Here, there are too many factors supporting the conclusion that the State acted with the subjective intent to cause a mistrial. The State chose to call Brown's great-aunt Detective Ashley to the stand knowing that she was related to the decedent. During the investigation, she did not advise her superiors that she was related to the decedent, even after learning his identity. The prosecutors knew of the relationship, however, because on direct examination, the State

addressed it. She testified to her belief that she was not ethically compromised and that she had, in fact, been involved in the criminal investigations of other family members.

[41] And although Detective Ashley was not the lead investigator on the case, as a corporal she had supervisory duties over those she outranked, and had been the field training officer for the lead investigator Detective Arwen LaMotte. She participated in the "war room" meetings with all of the investigators. Tr. Vol. 3, p. 88. And she interviewed witnesses at the house where Qualls was apprehended and collected articles of his clothing.

[42] On cross-examination, Qualls' counsel probed Detective Ashley's potential bias and asked why there was no investigation into whether the evidence supported or refuted his self-defense claim. It was during this exchange that Detective Ashley commented on Qualls' choice to remain silent. During the bench conference on the motion for a mistrial, the State conceded that it had not shown Detective Ashley a copy of the order in limine prohibiting her from discussing Qualls' right to remain silent.

[43] Although we agree with the court that there is no evidence in the record of collusion between the State and Detective Ashley, the State chose to place her on the stand in spite of her potential biases. As the court acknowledged, this was not Detective Ashley's first trial. And as the State observed, "she should've known better[.]" Tr. Vol. 3. p. 102. Early on, Qualls' counsel had filed a notice of the claim of self-defense. And questions about why the police did not

investigate the self-defense angle after Qualls' arrest was fair game. "'[T]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination . . . we have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Tibbs v. State*, 59 N.E.3d 1005, 1014-15 (Ind. Ct. App. 2016) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986)), *trans. denied*.

[44] Although a trial court's findings are "very persuasive[,]" they are not conclusive. *Butler*, 724 N.E.2d at 603-04. We disagree with the trial court's finding that the State or an agent of the State did not have any part in creating the circumstances leading to the mistrial. Detective Ashley's involvement as a supervisor and investigator in the case and any potential bias she had were open topics for cross-examination. The State chose to place her on the stand, creating the circumstances where those potential biases could be explored. And while the State failed to advise its witness of the order in limine prohibiting her from discussing Qualls' choice to exercise his right to remain silent, the twelve-year veteran volunteered the statement when questioned about her lack of consideration of the defense of self-defense and whether her familial relationship biased her investigation and/or supervisory role in the case.

[45] We conclude that the trial court's denial of the motion to dismiss the charges against Qualls after the mistrial was clearly erroneous. The record is filled with cumulative missteps by the State and its agents such that a retrial violated Qualls' constitutional protections against double jeopardy and, a retrial should

not have occurred. *See* I.C. § 35-41-4-3(a)(2)(iv) ("prejudicial conduct, in or outside the courtroom, made it impossible to proceed with the trial without injustice to either the defendant or the state[.]"). As such, we reverse and vacate Qualls' conviction of Class A misdemeanor dangerous possession of a firearm on this ground.

## II. Amended Information

[46] Qualls also challenges the trial court's decision to allow the State to amend the information to add counts of Level 1 felony attempted murder, Level 3 felony aggravated battery, and Level 5 felony criminal recklessness. Indiana Code section 35-34-1-5(c) (2014) provides that: "Upon motion of the prosecuting attorney, the court may, at any time before, during, or after the trial, permit an amendment to the indictment or information in respect to any defect, imperfection, or omission in form which does not prejudice the substantial rights of the defendant."

[47] The federal Due Process Clause of the Fourteenth Amendment and Article 1, Section 12 of the Indiana Constitution prohibit prosecutorial vindictiveness. *Blackledge v. Perry*, 417 U.S. 21, 25-29 (1974) *overruled on other grounds, Bordenkircher v. Hayes,* 434 U.S. 357, 360-65 (1978); *Owens v. State*, 822 N.E.2d 1075, 1077 (Ind. Ct. App. 2005). Our Supreme Court has also held that "the State could not bring more serious charges against the defendant when nothing has occurred except the successful exercise of the right to a fair trial." *Owens*, 822 N.E.2d at 1077. And the Court later clarified that "unless there is new

evidence or information discovered to warrant additional charges, the potential for prosecutorial vindictiveness is too great for courts to allow the State to bring additional charges against a defendant who successfully moves for a mistrial[,]" thus creating the presumption of prosecutorial vindictiveness. *Warner v. State*, 773 N.E.2d 239, 243 (Ind. 2002); *see also Schiro v. State*, 888 N.E.2d 828, 838 (Ind. Ct. App. 2008) (prosecutorial vindictiveness presumed when new charges are filed after defendant exercises right to appeal), *trans. denied*.

[48] The day of Qualls' mistrial, the State moved to amend the charges against him to include attempted murder and aggravated battery. The State's argument to the trial court was that, "During the course of trial, information was learned during opening statements and witness testimony which justifies the addition of these two charges." Appellant's App. Vol. 2, p. 81. The trial court initially denied that motion. At a subsequent hearing after the State filed a second motion to amend the charges, the State explained that prior to the mistrial, regarding the attempted murder and aggravated battery charges, "we were already considering, based on what the facts would come in, that we were going to be asking for those lesser included. So what we did was, after the trial ended up a mistrial, Ms. Boehm and I decided to . . . put them on notice . . . [of the] other charges so they're not just sprung on the jury at the end." Tr. Vol. 3, p. 134. Clearly, the first motion to amend was not based on new evidence. But the record reflects that what happened during the mistrial was that the witnesses' testimony supported Qualls' self-defense claim, and the State's

strategy to wait until the end of trial to ask for lesser-included offense instructions was not going to play out.

[49] The State's April 10, 2020 motion to amend the charges, which was granted by the trial court, again relied on "information [] learned during opening statements and witness testimony . . . " as to the attempted murder and aggravated battery counts. Appellant's App. Vol. 2, p. 176. The motion also relied on physical evidence, which the State already possessed prior to the mistrial. The inference drawn from the State's motion is that the first motion to amend the charges was filed without probable cause for the attempted murder and aggravated battery charges. And the obvious conclusion is that there was no new evidence to support filing the additional charges for attempted murder and aggravated battery.

[50] The motion also relied on "additional investigation." *Id.* According to the State, the information supporting the criminal recklessness charges became evident in December 2019. The State informed the court, "In early December 2019, a witness advised that there may be a bullet hole at her residence at 2014 N. Karwick that could be related to the December 18, 2018 incident. On December 10, 2019, a preliminary investigation done by Det. [McClintock] found that the damage appeared to be consistent with damage from a gunshot. Additional investigation was done by Det. McClintock in January showing that the trajectory of the bullet came from the location where the defendant was located on December 18, 2018 on Karwick Road and leading to the Criminal Recklessness charge to be added." Appellant's App. Vol. 2, p. 176. Qualls' first

trial took place on December 16 and 17, 2019, after Detective McClintock took pictures of damage to the window of the house.

[51] The tip about a bullet hole in a window was reported by the homeowner next door to Rouse's house prior to the start of Qualls' first trial. Detective McClintock testified about the photographs he took of the bullet hole, but the jury found Qualls not guilty of those charges, charges he should not have faced. As a result, the State's claim that the bullet evidence was discovered after the mistrial is unsupported by the record.

[52] We conclude that the State has not overcome the presumption of prosecutorial vindictiveness and the trial court should not have granted the motion to amend the information. Consequently, Qualls should not have faced trial on the Level 3 felony aggravated battery charge of which he was convicted. His conviction on this charge is reversed and vacated.

## Conclusion

[53] Based on the foregoing, we conclude that the trial court erred by concluding that the State did not create the circumstances which led to the mistrial, thus allowing a second trial to take place. Furthermore, we conclude that the trial court erred by allowing the State to amend the information because the State did not overcome the presumption of prosecutorial vindictiveness and did not show that the additional charges were the result of new evidence. Consequently, we reverse and remand with instructions to vacate Qualls' convictions.

Reversed and remanded.


Mathias, J., and Scheele, J., concur.


ATTORNEY FOR APPELLANT

Jessica R. Merino
Wyatt, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Megan M. Smith
Deputy Attorney General
Indianapolis, Indiana